## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KIMARIO ANDERSON, individually
and on behalf of the Coca-Cola Bottlers'
Association 401(k) Retirement Savings
Plan and all others similarly situated,

*Plaintiff*,

v.

COCA-COLA BOTTLERS' ASSOCIATION,
STEPHANIE R. GRIFFIN, and JOHN AND
JANE DOE DEFENDANTS 1–30,

*Defendants*.

Case No. _____

CLASS ACTION COMPLAINT

### INTRODUCTION

Plaintiff Kimario Anderson ("Plaintiff"), individually and on behalf of the Coca-Cola Bottlers' Association 401(k) Retirement Savings Plan (the "Plan") and a class of similarly situated participants in and beneficiaries of the Plan, brings this class action pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), against the Plan's fiduciaries, including the Coca-Cola Bottlers' Association ("CCBA"), Stephanie R. Griffin, and John and Jane Does 1–30 (collectively "Defendants") for breaches of their fiduciary duties.

Plaintiff brings this action by and through his undersigned attorneys based upon personal knowledge, information contained in the Plan's Summary Plan Description ("SPD"), the Plan's publicly-available Form 5500 series filings with the United States Department of Labor, the account information and statements provided to him as a participant in the Plan, and other information publicly available or obtained through counsel's preliminary investigation. Plaintiff anticipates that discovery will uncover further support for the allegations in this Complaint and, potentially, for additional claims.

As described herein, Defendants have breached their fiduciary duties to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries. Plaintiff brings this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA. Plaintiff brings this action and requests this relief for the benefit of the Plan and its participants and beneficiaries. In support of his claims, Plaintiff states and alleges as follows:

<u>**NATURE OF THE CASE**</u>

1.      This is a civil enforcement action brought on behalf of the Plan pursuant to the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA").

2.      This class action concerns the Plan and is brought on behalf of all persons who were and/or are participants in and beneficiaries of the Plan at any time during the six-year period preceding the filing of this Complaint and up through the present (the "Class Period").

3.      Defendants were fiduciaries of the Plan during the Class Period.

4.      Defendants were responsible for selecting, monitoring, and removing investment options made available to the Plan participants, as well as controlling and accounting for expenses of the Plan.

5.      The fiduciary obligations of plan fiduciaries to the participants and beneficiaries of an ERISA-governed plan are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598, 602 (8th Cir. 2009).

6.      Fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

7.      When selecting investment options for an ERISA-governed plan, the plan's fiduciaries are required to act for the exclusive benefit of the plan and its participants and beneficiaries, perform with undivided loyalty, act prudently, defray reasonable plan expenses, diversify investments to minimize large losses unless clearly prudent not to do so, and discharge their duties in accordance with the governing documents and instruments so long as they are consistent with ERISA. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

8.      Defendants failed to fulfill these duties.

9.      During the Class Period, Defendants could have leveraged the Plan's assets to qualify for lower-cost versions of the same investments, chosen less costly and equally or better-performing investment options for the Plan, and used the Plan's size to reduce recordkeeping fees.

10.     Also, during the Class Period, Defendants included as an option the Coca-Cola Common Stock Fund (an undiversified investment) instead of well-diversified options, even though The Coca-Cola Company's common stock performed poorly in comparison to its benchmark, thereby imposing more risk on and less return for participants.

11.     Plaintiff brings this action to remedy the losses the Plan has sustained as a result of these and other fiduciary breaches by Defendants and to obtain such further equitable or remedial relief as may be appropriate to redress and to enforce the provisions of ERISA.

12.     Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed, including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized Plans, total cost comparisons to similarly-sized Plans, information regarding other

available share classes, and information regarding the availability and pricing of collective trusts and separate accounts and market-rate recordkeeping costs.

13.    Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.

14.    Having never managed a large 401(k) plan such as the Plan, Plaintiff lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.

15.    Plaintiff did not and could not review the meeting minutes or other evidence of Defendants' fiduciary decision-making process, or the lack thereof.

16.    This Complaint is based upon reasonable inferences drawn from the facts set forth herein.

## THE PARTIES

17.    Defendant Coca-Cola Bottlers' Association ("CCBA") is a Georgia corporation with its headquarters located in Atlanta, Georgia.

18.    CCBA members consist of all 65 U.S. independent bottlers of Coca-Cola, as well as associate members that include bottler-owned production cooperatives.

19.    CCBA states that offers a wide array of programs for its members, including employee benefits, to "take advantage of the collective size and strength" of its membership and assist its members in reducing costs.

20.    One of the programs CCBA offers for its members is a 401(k) plan.

21.    The Coca-Cola Bottlers' Association 401(k) Retirement Savings Plan (the "Plan") is intended to be a multiple employer plan ("MEP") under 26 U.S.C. §413(c).

22.     As a sponsor and administrator of the Plan, CCBA is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

23.     More than half of CCBA's members participate in the Plan.

24.     The Plan's participants consist of current and former employees of independent companies that are members of CCBA.

25.     Defendant Stephanie R. Griffin, CCBA's Senior Relationship Manager, Employee Benefits, signed the Form 5500 on behalf of the Plan Administrator and Plan Sponsor and therefore is part of the group, or is the individual, that oversees and is responsible for administering the Plan.

26.     As such, Griffin was the individual or was part of the group that was delegated control over the management of the Plan and its assets, including developing and executing the Plan's Investment Policy Statement and investment policies and objectives; selecting and regularly monitoring the investment options in the Plan, including but not limited to the performance and costs of those investment options and comparing them to other better-performing or less-costly alternatives; and choosing and overseeing the Plan's third-party administrator, custodian, trustee, recordkeeper, and other service providers, monitoring their compensation, and minimizing the costs of such third-party services.

27.     Defendants John and Jane Does 1–30 are the individuals or were members of the group that oversees and is responsible for administering the Plan.

28.    As such, Defendants John and Jane Does 1–30 are or were the individuals or part of the group that was delegated control over the management of the Plan and its assets, including developing and executing the Plan's Investment Policy Statement and investment policies and objectives; selecting and regularly monitoring the investment options in the Plan, including but not limited to the performance and costs of those investment options and comparing them to other better-performing or less-costly alternatives; and choosing and overseeing the Plan's third-party administrator, custodian, trustee, recordkeeper, and other service providers, monitoring their compensation, and minimizing the costs of such third-party services.

29.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

30.    ERISA treats as fiduciaries not only persons expressly named as fiduciaries under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.

31.    Defendants are, or during the Class Period were, fiduciaries of the Plan under ERISA.

32.    Defendants were fiduciaries of the Plan because they were so named; they exercised authority or control respecting management or disposition of the Plan's assets; they exercised discretionary authority or discretionary control respecting management of the Plan; or they had discretionary authority or discretionary responsibility in the administration of the Plan.

33.    Plaintiff Kimario Anderson is a resident of Kansas.

34.    Plaintiff Anderson was employed by Heartland Coca-Cola Bottling Company, LLC ("Heartland"), a Kansas corporation.

35.     Heartland is a member of CCBA and is a participating employer in the Plan.

36.     Plaintiff Anderson participated in the Plan during the Class Period and has suffered harm as a result of Defendants' breaches of their fiduciary duties under, and violations of, ERISA.

37.     Plaintiff Anderson brings these claims individually and on behalf of the Plan and a class of participants in and beneficiaries of the Plan.

38.     Defendant CCBA may be served with process through its registered agent, John Gould, at 3282 Northside Parkway Suite 200, Atlanta, Georgia 30327.

39.     Defendant Griffin may be served at 317 Mirramont Ct., Woodstock, GA 30189-8219.

<u>**JURISDICTION AND VENUE**</u>

40.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

41.     Plaintiff received and expected to receive his benefits from the Plan in Kansas.

42.     Plaintiff participates in the Plan through his Kansas employer, Heartland.

43.     Defendants solicited Heartland's membership and communicated information about the Plan to Heartland in Kansas.

44.     Defendants continue to communicate Plan information to Heartland and other employer sponsors in Kansas.

45.     Defendants communicated information about the Plan to Plaintiff in Kansas.

46.     ERISA provides for nationwide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

47.     The Court has personal jurisdiction over this case, and venue is proper in this District.

48.     The Court also has personal jurisdiction over Defendants pursuant to Fed. R Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Kansas.

## ERISA'S FIDUCIARY STANDARDS

49.     To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty, prudence, diversification, and compliance with the plan document upon plan fiduciaries. 29 U.S.C. § 1104(a)(1). These fiduciary duties apply to Defendants because they are fiduciaries of the Plan.

50.     ERISA § 404(a)(1), 29 U.S.C.§ 1104(a)(1), imposes a "prudent person" standard of care on plan fiduciaries:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and —

(A)     for the exclusive purpose of:

(i)     providing benefits to participants and their beneficiaries; and
(ii)    defraying reasonable expenses of administering the plan;

(B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(C)     by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D)     in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV.

51.     ERISA also imposes co-fiduciary duties on plan fiduciaries. ERISA § 405, 29

U.S.C. § 1105, states in relevant part that:

> In addition to any liability which he may have under any other provision of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act
>         or omission of such other fiduciary, knowing such act or omission is a
>         breach;
>
> (2)     if, by his failure to comply with section 404(a)(1) in the administration of
>         his specific responsibilities which give rise to his status as a fiduciary, he
>         has enabled such other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he makes
>         reasonable efforts under the circumstances to remedy the breach.

52.     Under ERISA, fiduciaries who exercise discretionary authority or control over the

selection of plan investments must act prudently and solely in the interest of participants and

beneficiaries of the plan.

53.     Thus, "the duty to conduct an independent investigation into the merits of a

particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys*

*Savings 401(k) Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

54.     An ERISA fiduciary has a continuing duty to monitor investments and remove

imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015). Prudence requires a

review at "regular intervals." *Id.* at 1828.

55.     As the Department of Labor explains:

> [T]o act prudently, a plan fiduciary must consider, among other factors, the
> availability, riskiness, and potential return of alternative investments for his or her
> plan. [Where an investment], if implemented, causes the plan to forego other
> investment opportunities, such investments would not be prudent if they provided
> a plan with less return, in comparison to risk, than comparable investments

available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

56.     A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan

participants and beneficiaries, as the Department of Labor has explained:

> [T]he Department has construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to participants and beneficiaries, as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. In other words, in deciding whether and to what extent to invest in a particular investment, or to make a particular fund available as a designated investment alternative, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment, or to designate an investment alternative, may not be influenced by non-economic factors unless the investment ultimately chosen for the plan, when judged solely on the basis of its economic value, would be equal to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988).

57.     In a separate publication, the Department of Labor further explains:

> The Federal law governing private-sector plan, the Employee Retirement Income Security Act (ERISA), requires that those responsible for managing a plan – referred to as fiduciaries – carry out their responsibilities prudently and solely in the interest of the plan's participants and beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable.
>
> . . . .
>
> Plan fees and expenses are important considerations for all types of plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.
>
> . . . .

By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

U.S. Dep't of Labor Emp. Benefits Sec. Admin., *Understanding Retirement Plan Fees and Expenses* 1–2, 4 (2011), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/ resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf.

### GENERAL ALLEGATIONS

58.  The Plan is a "defined contribution" plan under ERISA.

59.  A defined contribution plan is a type of retirement plan in which the employer, employee, or both make contributions on a regular basis, individual accounts are set up for participants, and benefits are based on the amounts credited to these accounts (through employee contributions and, if applicable, employer contributions), plus any investment earnings on the money in the account.

60.  Contributions to the Plan are made in the form of salary deferral contributions by individual employee participants, through the participant's employer in the form of employer matching contributions, and through profit-sharing contributions.

61.  Participants' contributions vest immediately and safe harbor matching and profit-sharing contributions vest 100% after two years of service.

62.  Defendants selected and retained various investment options made available to participants in the Plan and chose the recordkeeper for the Plan.

63.  At the choice and discretion of Defendants, various investment options are made available to participants in the Plan.

64.     As of December 31, 2018, for example, the Plan included 24 investment options: 22 mutual funds; one collective investment trust fund; and a Coca-Cola Common Stock Fund.

65.     By December 31, 2018, the Plan had more than 19,000 participants and managed more than $650,000,000 in total assets, approximately $540,000,000 of which was invested in mutual funds.

66.     According to the Plan's 2019 Form 5500, as of December 2019 the Plan had more than $799,000,000 in net assets.

67.     Based on the most recent data available to Plaintiff, the Plan would be in the top 0.1% of all 401(k) plans based on size, in terms of both plan assets and number of plan participants.

68.     A "'multiple employer plan' can refer to a variety of different kinds of employee-benefit arrangements," including sponsorship of a defined contribution retirement plan by "a group or association of employers." 84 Fed. Reg. 37508, 37512 (July 31, 2019).

69.     "Grouping small employers together into a MEP" in this way can "facilitate savings through administrative efficiencies" and "price negotiation." *Id.* at 37533.

70.     MEPs achieve economies of scale of large plans that provide a "distinct economic advantage[]" of lower administrative costs for individual employers. *Id.*

71.     MEPs create cost efficiencies in at least two ways: "First, as scale increases, marginal costs for MEPs . . . diminish and MEPs . . . spread fixed costs over a larger pool of member employers and employee participants, creating direct economic efficiencies. Second, larger scale may increase the negotiating power of MEPs." *Id.*

72.     MEPs operating as a large single plan can secure lower-cost administrative services from service providers.

73.     Because the Plan is an MEP, it is a single Plan with a single Plan document that all participating employers must agree to and cannot alter.

74.     Furthermore, the Plan files a single Form 5500 with the Department of Labor.

75.     Because of the Plan's size, CCBA had, and continues to have, the ability to choose investment options not generally available and had and has significant bargaining power with respect to the fees and expenses that were charged against participants' investments and the fees and expenses charged for recordkeeping services.

76.     Indeed, as CCBA itself recognizes: "**In 401k Plan pricing, size is power; and this Plan is massive.**" *Defined Contribution Plan (401k)* (last visited Jan. 25, 2021), https://ccbanet.com/programs/employee-benefits/defined-contribution-plan-401k/.

77.     But, as described below, Defendants did not take advantage of this leverage and bargaining power, nor did they take appropriate actions to reduce the Plan's investment and recordkeeping expenses, or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

**Defendants Failed to Properly Investigate and Select
Lower Cost Investment Options for Plan Participants.**

78.     As the Plan's fiduciaries, Defendants must engage in a prudent and loyal process to select, monitor, remove, and retain Plan investment options.

79.     As noted above, under 29 U.S.C. § 1104(a)(1), Defendants must provide diversified investment options for the Plan. But diversification is not the only consideration for a prudent and loyal fiduciary.

80.     ERISA also requires Defendants to evaluate and monitor the fees and costs associated with the Plan's investment options, and to give substantial consideration to those fees and costs when determining which options to remove or retain.

81.     As explained below, Defendants failed to offer Plan participants similar investment options to those in the Plan that were less costly and better performing, failed to take advantage of savings offered by lower cost share classes of mutual funds already in the Plan, and failed to consider investment vehicles with lower fees than those in the Plan, such as collective trusts (also called "collective investment trusts" and "collective trust funds"), commingled accounts, and separate accounts.

82.     Had Defendants fulfilled their duties under ERISA and engaged in a prudent and loyal process to select, monitor, retain, and remove investment options from the Plan, these failures would not have occurred.

83.     Defendants' actions were contrary to the actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

### Defendants Imprudently Retained Investment Options in the Plan Despite the Availability of Similar, Lower-Cost, Better-Performing Options.

84.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act § 7 (hereinafter "UPIA").

85.     Defendants' duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.

86.     Costs not paid by the employer, such as administrative, investment, legal, and compliance costs, are effectively paid by plan participants.

87.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from

companies like Morningstar, which sort investments of all kinds into categories based on the underlying securities in each portfolio.

88.    ERISA-mandated monitoring of investments leads prudent and impartial plan fiduciaries to continually evaluate performance and fees, resulting in great competition among investment providers in the marketplace.

89.    Prudent and impartial plan sponsors should be monitoring both the performance and cost of the investments selected for 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

90.    Defendants failed to consider and select lower cost investment options that were similar to or in the same investment style as those being offered in the Plan.

91.    For example, Defendants should have realized that the T. Rowe Price target date mutual funds were directing a substantial portion of their assets into the proprietary T. Rowe Price Equity Index 500 fund, which charged a fee that Morningstar called "outrageous":

> Target-date managers can better serve investors by using cheap options when selecting underlying index funds. There are over 40 large-cap passive options used within target-date funds, ranging from large-value to equally weighted indexes, but most reside in the large-blend Morningstar Category and track the S&P 500. Despite near identical objectives, prices vary. Fees range from cheap—Schwab and State Street both charged 0.03% on their U.S. large-cap index offerings—to simply outrageous—MainStay offers its MainStay S&P 500 Index for 0.35% and T. Rowe Price charges 0.25% for T. Rowe Price Equity Index 500, which has $27 billion in assets.

Morningstar 2017 Target-Date Fund Landscape Report (Apr. 21, 2017).

92.    Thus, Defendants served up target date funds that, for at least part of the Class Period, directed a substantial portion of their assets to an S&P 500 fund that charged more than seven times the market rate.

93.     The chart below sets forth examples of various Plan investment options, and how much more expensive they were compared to substantially similar alternative investment options that were available to the Plan (using, as an example, 2018 expense ratio data):

| In Plan/ Similar Low Fee Alternatives | Investment Option | Expense Ratio | % In-Plan Fee Exceeds Alternative Low Fee |
|---|---|---|---|
| In Plan | T. Rowe Price Retirement 2030 (TRRCX) | 0.67% | |
| Low Fee Alternative | State Street Target Retirement 2030 K (SSBYX) | 0.09% | 644.44% |
| | | | |
| In Plan | T. Rowe Price Retirement 2040 (TRRDX) | 0.72% | |
| Low Fee Alternative | State Street Target Retirement 2040 K (SSCQX) | 0.09% | 700% |
| | | | |
| In Plan | T. Rowe Price Retirement 2050 (TRRMX) | 0.72% | |
| Low Fee Alternative | State Street Target Retirement 2050 K (SSDLX) | 0.09% | 700% |
| Low Fee Alternative | TLLPX TIAA-CREF Lifecycle Index 2050 Premier (TLLPX) | 0.25% | 188% |
| | | | |
| In Plan | T. Rowe Price Retirement 2060 (TRRLX) | 0.72% | |
| Low Fee Alternative | State Street Target Retirement 2060 K (SSDYX) | 0.09% | 700% |
| Low Fee Alternative | TIAA-CREF Lifecycle Index 2060 Premier (TVIPX) | 0.25% | 188% |
| | | | |
| In Plan | Mainstay Large Cap Growth (MLAIX) | 0.75% | |
| Low Fee Alternative | Vanguard U.S. Growth Fund Admiral (VWUAX) | 0.30% | 150% |
| | | | |
| In Plan | Hartford Midcap R5 (HFMTX) | 0.86% | |
| Low Fee Alternative | Vanguard Mid-Cap Growth Index Admiral (VMGMX) | 0.07% | 1128.57% |
| Low Fee Alternative | Bridge Builder Small/Mid Growth (BBGSX) | 0.42% | 104.76% |

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |
| In Plan | American Funds Balanced R4 (RLBEX) | 0.63% |  |
| Low Fee Alternative | Vanguard Balanced Index I (VBAIX) | 0.06% | 950% |
|  |  |  |  |
| In Plan | American Funds Europacific Growth R4 (REREX) | 0.83% |  |
| Low Fee Alternative | VWILX Vanguard Int'l Growth Admiral | 0.32% | 159.38% |
|  |  |  |  |
| In Plan | Goldman Sachs Small Cap Value Inst. (GSSIX) | 0.94% |  |
| Low Fee Alternative | Vanguard Small Cap Index (VSCIX) | 0.04% | 2,250% |

94.     The low fee investment option alternatives listed in the chart above performed comparably with or better than, and in some cases significantly better than, their comparable option in the Plan.

**Defendants Failed to Take Advantage of Lower Cost Share Classes of the Mutual Funds in the Plan.**

95.     Beyond their failure to properly monitor the Plan's investment options and offer substantially similar alternative options that cost substantially less (and performed better), Defendants also failed to take advantage of lower-cost shares and utilize lower-cost CIT versions of the investment options they did offer.

96.     Larger asset balances in 401(k) plans lead to economies of scale and special pricing within mutual funds and other investment products.

97.     Larger 401(k) plans should have significantly lower asset-weighted average expense ratios than smaller plans.

98.     The Plan's expense ratios were multiples of what they should have been given the bargaining power available to Defendants.

99.     For example, many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors with more expensive share classes generally targeted at smaller investors with less bargaining power, while lower cost shares are targeted at "institutional investors" with more assets (generally, $1 million or more) and therefore greater bargaining power.

100.    Typically, there is no difference between share classes other than cost—*i.e.*, the funds hold identical investments and have the same manager.

101.    Large defined contribution plans, such as the Plan, qualify for these lowest-cost share classes.

102.    Prudent fiduciaries will search for and select the lowest-priced share class available.

103.    Any reasonable, prudent fiduciary would know that an institutional class share ("I-share") is a preferable and less-expensive alternative to an investor class share and would have no reason not to promptly switch to that less-expensive alternative.

104.    During the Class Period, Defendants offered only investor class shares of the mutual funds in the Plan.

105.     At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes of the mutual funds in the Plan and thus also should have promptly identified the prudence of transferring the Plan's funds into these lower cost share classes.

106.    Yet, even though the Plan's size and scale would have made it possible for the fiduciaries to select identical lower cost share counterparts much earlier during the Class Period, Defendants repeatedly failed to take action to utilize the Plan's "massive" scale.

107.    As demonstrated by the chart below, Defendants failed to ensure that the Plan was invested in the lowest-cost share class available for the Plan's mutual funds and did not promptly switch to these lower cost alternatives when they became available.

108.    The following chart provides an example of how much more expensive the funds in the Plan were than their identical, lower-cost counterparts (using 2018 expense ratios):

| Fund in Plan | 2018 Expense Ratio | Lower Cost Share Class | 2018 Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| American Funds American Balanced R4 (RLBEX) | 0.63% | American Funds American Balanced R6 (RLBGX) | 0.28% | 125% |
| American Funds Europacific Growth R4 (REREX) | 0.83% | American Funds Europacific Growth R6 (RERGX) | 0.49% | 69% |
| Columbia Dividend Income A (LBSAX) | 0.96% | Columbia Dividend Income Inst (CDDYX) | 0.58% | 66% |
| Fidelity Small Cap Growth (FCPGX) | 1.02% | Fidelity Small Cap Growth Inst. (FIDGX) | 0.90% | 13% |
| Hartford MidCap R5 (HFMTX) | 0.86% | Hartford MidCap R6 (HFMVX) | 0.76% | 13% |

| | | | | |
|---|---|---|---|---|
| Invesco Developing Markets Y (ODVYX) | 1.05% | Invesco Developing Markets Inst. (ODVIX) | 0.87% | 21% |
| JPMorgan Mid Cap Value I (JMVSX) | 0.98% | JPMorgan Mid Cap Value Inst (FLMVX) | 0.75% | 31% |
| MainStay Winslow Large Cap Growth I (MLAIX) | 0.74% | MainStay Winslow Large Cap Growth R6 (MLRSX) | 0.63% | 17% |
| Metropolitan West Total Return Bd M (MWTRX) | 0.67% | Metropolitan West Total Return Bd Inst. (MWTIX) | 0.45% | 49% |
| MFS Value R4 (MEIJX) | 0.58% | MFS Value R6 (MEIKX) | 0.48% | 21% |
| Principal Global Real Estate Sec Inst. (POSIX) | 0.94% | Principal Global Real Estate Sec R6 (PGRSX) | 0.88% | 7% |
| T. Rowe Price Growth Stock (PRGFX) | 0.67% | T. Rowe Price Growth Stock Inst. (PRUFX) | 0.52% | 29% |
| Wells Fargo Stable Return Fund Class N35 | 0.76% | Wells Fargo Stable Return Fund Class N | 0.41% | 85% |

109.    No prudent, loyal reason exists not to have offered Plan participants available I-shares or other lower-cost share classes.

110.    Had Defendants engaged in a prudent, loyal process to select, monitor, retain, and remove investment options from the Plan, they would have included I-shares or other lower-cost share classes of the mutual funds in the Plan.

**_Defendants Failed to Offer the Collective Trust Version of the T. Rowe Price Target Date Mutual Funds in the Plan, Costing Plan Participants Significantly More in Fees for an Identical Product._**

111.    Plan fiduciaries must be continually mindful of the types of investment options available to ensure they do not unduly risk plan participants' savings or charge unreasonable fees.

112.    For the majority of the Class Period, Defendants did not utilize the Plan's assets to substantially reduce fees by moving assets from mutual funds to lower-cost institutional vehicles, like collective investment funds or separate accounts, that provided an identical product.

113.    Like mutual funds, collective trusts pool plan participants' investments, but can provide an even lower fee alternative compared to I-share classes of mutual funds.

114.    Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds, and cash.

115.    Regulated by the Office of the Comptroller of the Currency, rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements and cannot advertise or issue formal prospectuses.

116.    Collective trusts thus have much lower costs than mutual funds, with less or no administrative costs and less or no marketing or advertising costs.

117.    Collective trusts have been used for decades by retirement plans.

118.    Collective trusts contract directly with 401(k) plans and provide regular reports regarding costs and investment holdings.

119.    Many if not most mutual fund strategies are available in collective trust format, and in such instances the investments in the collective trusts are identical to those held by the mutual fund.

120.    The T. Rowe Price Retirement Trusts collective trust has the same portfolio management team, glidepath, subasset-class exposure, tactical allocation overlay and underlying investments' as the mutual fund-based T. Rowe Price Retirement Funds target-date series.

121.    At all times during the Class Period, Defendants knew or should have known of the existence of collective trusts and should therefore have promptly identified the prudence of transferring the Plan's funds into these lower cost alternative investments.

122.    Despite the clear advantages of the collective trusts listed below, Defendants failed to promptly switch to these lower cost alternatives.

123.    These failures reveal that Defendants did not prudently monitor the Plan's investment options.

124.    In simple terms, Defendants failed to timely switch to an investment option that was the same investment in a different wrapper at a much lower price.

125.    Since at least 2015, the beginning of the Class Period, Defendants could have offered the collective trust versions of the T. Rowe Price target date mutual funds in the Plan.

126.    The T. Rowe Price collective trust target date funds were less expensive than the identical mutual fund versions utilized by the Plan.

127.    Other fiduciaries of large plans were prudently paying attention and using their scale to drive down costs in this way. For example, Garmin moved from T. Rowe Price mutual funds to T. Rowe Price collective investment trusts as early as 2014.

128.    At all times during the Class Period, the Plan had enough assets in the T. Rowe Price target date mutual funds needed to qualify for the collective trust target date fund.

129.    The following chart provides an example of how much more expensive the Plan's T. Rowe Price target date funds were than their identical collective trust counterparts in 2018:

| T. Rowe Price Target Date Fund in Plan | Expense Ratio | T. Rowe Price Lower Cost Institutional Class/Collective Trust | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| TRP RETIREMENT 2010 (TRRAX) | 0.54% | TRP RETIREMENT TRUST F 2010 | 0.43% | 26% |
| TRP RETIREMENT 2020 (TRRBX) | 0.61% | TRP RETIREMENT TRUST F 2020 | 0.43% | 42% |
| TRP RETIREMENT 2030 (TRRCX) | 0.67% | TRP RETIREMENT TRUST F 2030 | 0.43% | 56% |
| TRP RETIREMENT 2040 (TRRDX) | 0.72% | TRP RETIREMENT TRUST F 2040 | 0.43% | 67% |
| TRP RETIREMENT 2050 (TRRMX) | 0.72% | TRP RETIREMENT TRUST F 2050 | 0.43% | 67% |
| TRP RETIREMENT 2060 (TRRLX) | 0.72% | TRP RETIREMENT TRUST F 2060 | 0.43% | 67% |

130.    A prudent fiduciary conducting a prudent, impartial review of the Plan's investments would have identified the collective trust option and transferred the Plan's investments into the above-referenced fund collective trusts at the earliest opportunity.[1]

131.    Apparently recognizing this, but years later than a prudent fiduciary world have, in 2019 Defendants finally replaced the T. Rowe Price target date mutual funds with their equivalent collective trust counterparts.

132.    Considering well-known industry trends, publicly available information from sources such as Morningstar and the activities of other fiduciaries, Defendants were or should have been aware at all times during the Class Period of the benefits of these lower-cost alternative investment vehicles.

133.    The Plan incurred excess fees due to Defendants' failure to adequately investigate the availability of collective trusts or separate accounts in the same investment style of mutual funds in the Plan.

134.    Because of the Plan's size, it could have reaped considerable cost savings by using collective trusts or separate accounts.

135.    Failing to incorporate the T. Rowe Price collective trust options before 2019 shows that Defendants did not employ a prudent, loyal process to select, monitor, remove, and retain investment options.

136.    Defendants' failure to monitor investment options and identify and implement the lowest cost alternatives during the Class Period violated ERISA and cost the Plan and its participants millions of dollars.

---

[1] Moreover, not only did Defendants fail to utilize the collective trust version of these funds, they inexplicably offered the investor share classes, rather than the cheaper I-share classes, of these T. Rowe Price target date mutual funds.

**Defendants Retained the Non-Diversified Coca-Cola Common
Stock Fund Despite Its Higher Risk and Underperformance.**

137.     The Plan offers a Coca-Cola Common Stock Fund, which is a single-stock fund

consisting of stock of the Coca-Cola Company ("Coca-Cola").

138.     A single-stock fund has inherent concentration (*i.e.*, non-diversification) risk.

139.     The Coca-Cola Common Stock Fund included in the Plan does not qualify for

Employee Stock Ownership Plan ("ESOP") status under ERISA.

140.     CCBA's members, and thereby participating employers in the Plan, are

independent bottling companies.

141.     CCBA and its members, and their respective employees, are not employed by

Coca-Cola.

142.     The Plan's Coca-Cola Common Stock Fund is not an employer security.

143.     Because the Plan is not an ESOP, and the Coca-Cola Common Stock Fund is not

an employer security, the fiduciaries had a duty to diversify the Plan's investments.

144.     The Coca-Cola Common Stock Fund is not diversified as required by ERISA.

145.     The Department of Labor explained:

[T]o act prudently, a plan fiduciary must consider, among other factors, the
availability, riskiness, and potential return of alternative investments for his or her
plan. [Where an investment], if implemented, causes the plan to forego other
investment opportunities, such investments would not be prudent if they provided
a plan with less return, in comparison to risk, than comparable investments
available to the plan, or if they involved a greater risk to the security of plan assets
than other investments offering a similar return.

DOL Opinion 88-16A (1988).

146.     On the statements sent out by the Plan, the benchmark index used for the Coca-

Cola Common Stock Fund was the S&P 500 Index.

147.     The Coca-Cola Common Stock Fund had a return that was less than half of this Plan-selected benchmark over the one-, five-, and ten-year periods ending June 30, 2020.

148.     The Coca-Cola Common Stock Fund reduced Plan participants' retirement benefits because retaining the fund caused Plan participants to forgo other investment opportunities and options that would have provided Plan participants with higher returns and less risk.

149.     This imprudent, disloyal, and non-diversified investment resulted in Plan participants losing out in millions of dollars in additional retirement savings.

150.     Including and retaining this non-diversified, underperforming single-stock fund as an investment option in the Plan was imprudent and evidence of an imprudent and disloyal decision-making process.

151.     Because of CCBA's members' business partnerships with the Coca-Cola Company, CCBA and the other Defendants had a conflict and placed the interests of CCBA members and/or the Coca-Cola Company ahead of Plan participants and beneficiaries.

**Defendants' Relationship with Wells Fargo**

152.     Wells Fargo Bank, N.A. ("Wells Fargo") acted as the Plan's recordkeeper during the Class Period.

153.     For part of the Class Period, Wells Fargo's affiliate, Wells Fargo Advisors, served as a third-party advisor to the Plan and was paid $68,939 out of Plan assets for its services.

154.     While Wells Fargo Advisors was providing advice to the Plan, the Plan's investment options included three Wells Fargo funds.

155.     Plan participants invested more than $35 million in these three Wells Fargo funds, further enriching Wells Fargo through the additional management fees on these funds.

156.     Thereafter and throughout the Class Period, Defendants retained the Wells Fargo Stable Return Fund in the Plan as an investment option, even though there were cheaper and better-performing stable value options available.

157.     Because Defendants' retained the Wells Fargo Stable Return Fund in the Plan, Plan participants invested in that Fund would have paid fees to Wells Fargo in addition to what the Plan was already paying Wells Fargo for recordkeeping.

158.     Plan participants invested millions in the Wells Fargo Stable Return Fund, consistently making it one of the largest funds in the Plan's line-up and generating even more fees for Wells Fargo.

159.     For example, as of December 31, 2015, participants invested over $23 million in the Wells Fargo Stable Return Fund, making it the single largest non-target date fund in the line-up.

160.     The Wells Fargo Stable Return Fund was still the largest non-target date fund in the Plan as of December 31, 2019, holding well over $49 million of Plan participant's retirement savings.

161.      Even though the Wells Fargo Stable Return Fund Class N has been available since October 1, 1985, at a cost of 41 basis points, the Plan was using the Wells Fargo Stable Return Fund Class N35 during the Class Period at a cost of approximately 76 basis points—more than 85% more expensive than its identical Class N counterpart.

162.     Moreover, as of fourth quarter 2016, the Wells Fargo Stable Return Fund Class N35 had long been underperforming compared to its peer group.

163.     As of December 31, 2017, the Wells Fargo Stable Return Fund Class N35 remained in the bottom half of its peer group with respect to fees and again was in the bottom half of its peer group for performance for the prior year.

164.     While performance improved for the year ending December 31,2018, the fees for the Wells Fargo Stable Return Fund Class N35 remained high enough to keep the Class N35 in the bottom half of its peer group.

165.     Defendants could have reduced the costs of this fund by almost 50% by simply including Class N in the Plan instead of Class N35.

166.     When Defendants finally realized that Plan participants were paying too much, and replaced the Wells Fargo Stable Return Fund Class N35 with the Wells Fargo Stable Return Fund Class N, they nevertheless chose to keep millions of Plan-participant dollars in yet another Wells Fargo fund that then ranked in the bottom 5% when compared to returns of similar funds for the one year ending December 31, 2019, the bottom 35% based on the three years ending December 31, 2019, and only barely in the top 50%  for the five years ending December 31, 2019.

167.     As of December 31, 2020, the Wells Fargo Stable Return Fund's (Class N shares) performance was in the bottom 10% for the prior one-year period, bottom 10% for the prior three-year period, and bottom 20% for the prior five-year period.

168.     By including and retaining both the Wells Fargo Stable Return Fund Class N35 and then the Wells Fargo Stable Return Fund Class N in the Plan, Defendants showed that they were more loyal to Wells Fargo than to the Plan and its participants.

169.     No conflict-free, loyal, prudent process for selecting, retaining, and monitoring the Plan's investment options would lead fiduciaries to retain the Wells Fargo Stable Return Fund Class N35 or the Wells Fargo Stable Return Fund Class N in the Plan.

**Defendants Allowed the Plan to Pay Unreasonable Recordkeeping Fees.**

170.    As noted above, under 29 U.S.C. § 1104(a)(1), Defendants must "defray[] reasonable expenses of administering the plan" and act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

171.    One of the responsibilities of administering the Plan is to select and retain a recordkeeper, paying only reasonable expenses.

172.    Defendants utilized Wells Fargo as the recordkeeper throughout the Class Period until January 2021.

173.    Prior to 2019, Wells Fargo was paid in various ways, including revenue-sharing and other indirect methods that were not transparent.

174.    However, at all times in the Class Period, and continuing even now, Defendants never chose to pay Wells Fargo based on a method that was directly tied to the amount of recordkeeping work that it did for the Plan, nor did they choose to pay Wells Fargo based on the fair market value of the services it provided to the Plan.

175.     Based on the Plan's Form 5500 filings, as well as other available documents, it appears the recordkeeping fees Wells Fargo charged the Plan during the Class Period, equate to the following on a per-participant basis:

| Year | Per-Participant Recordkeeping Fee |
|------|-----------------------------------|
| 2015 | $109 |
| 2016 | $62 |
| 2017 | $49 |
| 2018 | $65 |

| 2019 | $63 |
|------|-----|

176.    These recordkeeping fees far exceeded the reasonable, market rate for similarly sized plans during the Class Period.

177.    Had Defendants properly discharged their fiduciary duties in accordance with ERISA, they would have continually monitored Wells Fargo's recordkeeping fees and negotiated reductions that were in line with the market. Defendants' failure to do so resulted in damages to the Plan and a reduction in retirement benefits for Plan participants.

<u>CLASS ACTION ALLEGATIONS</u>

178.    In addition to bringing this action on behalf of the Plan, pursuant to ERISA, Plaintiff also brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class defined as:  All participants in and beneficiaries of the Plan during the six-year period preceding the filing of this Complaint through the present, with the exception of Defendants, Defendants' beneficiaries, and Defendants' immediate families.

179.    Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

180.    The class satisfies the numerosity requirement because it is composed of thousands of persons, in numerous locations.

181.    The Plan had thousands of participants and beneficiaries in every year of the Class Period, all of whom suffered from the limited, imprudent investment options and excessive and improper fees alleged herein.

182.    The number of class members is so large that joinder of all its members is impracticable.

183.    There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members.

184.    Common legal and factual questions include, but are not limited to:

A.    Whether Defendants were fiduciaries responsible for monitoring and making decisions with respect to the investments in the Plan and services for the Plan;

B.    Whether the investment decisions made by Defendants were prudent;

C.    Whether the investment decisions made by Defendants were solely in the interests of Plan participants and beneficiaries;

D.    Whether the Plan suffered losses as a result of Defendants' fiduciary breaches; and

E.    Whether Defendants' acts proximately caused losses to the Plan and, if so, the appropriate relief to which Plaintiff, on behalf of the Plan and the Class, are entitled.

185.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims, and the claims of all Class members, arise out of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

186.    Plaintiff will fairly and adequately represent the Class and has retained counsel competent in the prosecution of ERISA class action litigation.

187.    Plaintiff has no interests antagonistic to those of other members of the Class.

188.    Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

189.    Plaintiff has standing to bring this action on behalf of the Plan because he is a participant in the Plan and was injured by Defendants' unlawful conduct.

190.    Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently or as of the time the account was distributed, and what his accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

191.    Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

192.    Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

193.    In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

194.    In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

**CAUSE OF ACTION: BREACH OF FIDUCIARY DUTIES UNDER ERISA**

195.     Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

196.     At all relevant times, Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

197.     As explained above, as the fiduciaries in charge of a "massive" retirement plan, Defendants breached their fiduciary duties to the Plan and its participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

198.     As detailed above, Defendants had fiduciary responsibilities with respect to selecting, monitoring, and removing investment options in the Plan and minimizing recordkeeping fees.

199.     As detailed above, Defendants caused the Plan to invest millions of dollars in investment options that were not in keeping with their fiduciary responsibilities, and Defendants failed to monitor and minimize the Plan's recordkeeping costs.

200.     By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of 29 U.S.C. § 1104(a)(1)(A).

201.     By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would

use in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

202.     By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan in a manner that diversified the investments of the plan so as to minimize the risk of large losses, in violation of 29 U.S.C. § 1104(a)(1)(C).

203.     Each Defendant knowingly participated in each violation by the other Defendants, knowing that such acts were a violation, enabled the other Defendants to commit violations by failing to lawfully discharge such Defendant's own duties, and knew of the violations by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy those violations.

204.     Accordingly, each Defendant is also liable for the violations by its co-fiduciaries under 29 U.S.C. § 1105(a).

205.     As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid substantial excess investment management, recordkeeping, and other fund-related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109 and 29 U.S.C § 1132(a)(2).

206.     The Plan and its participants suffered millions of dollars of losses due to these excessive costs and lower net investment returns.

207.     If Defendants had complied with their fiduciary obligations, then the Plan would not have suffered these losses, and Plan participants would have more money available to them for their retirement.

208.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

209.     In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

<u>**PRAYER FOR RELIEF**</u>

210.     WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that Plaintiff may proceed on behalf of the Plan, in accordance with ERISA;

B.     A determination that this action may proceed as a class action under Rule 23(b)(1) or, in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

C.     Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

D.     A declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

E.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

F.      An order requiring CCBA to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against CCBA as necessary to effectuate said relief, and to prevent CCBA's unjust enrichment;

G.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

H.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

I.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

J.      An award of pre-judgment interest;

K.      An award of costs pursuant to 29 U.S.C. § 1132(g);

L.      A service award to the Class Representative;

M.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

N.      Such other and further relief as the Court deems equitable and just.

<u>**D**ESIGNATION OF **P**LACE OF **T**RIAL</u>

Plaintiff designates Kansas City, Kansas, as the place of trial of this cause of action.

Respectfully submitted by,

*/s/ Scott C. Nehrbass*
Scott C. Nehrbass, KS #16285
Nancy E. Musick, KS #28258
FOULSTON SIEFKIN LLP
32 Corporate Woods, Suite 600
9225 Indian Creek Parkway
Overland Park, KS  66210-2000
Phone:   913.253.2144
Fax:        913.498.2101
Email: snehrbass@foulston.com
            nmusick@foulston.com

Boyd A. Byers, KS #16253
Alexandra N.C. Rose, KS #27247
FOULSTON SIEFKIN LLP
1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466
Phone:   316.267.6371
Fax:        316.267.6345
Email: bbyers@foulston.com
            nrose@foulston.com

ATTORNEYS FOR PLAINTIFF