## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KIMARIO ANDERSON, individually and on behalf of the Coca-Cola Bottlers' Association 401(k) Retirement Savings Plan and all others similarly situated, | |
| *Plaintiff*, | Case No. 21-cv-02054 |
| v. | |
| COCA-COLA BOTTLERS' ASSOCIATION, THE COCA-COLA BOTTLERS' ASSOCIATION 401(K) SAVINGS PLAN BENEFIT COMMITTEE, STEPHANIE R. GRIFFIN, ANN BURTON, SUZY HIGGINBOTHAM, JOHN GOULD, and JOHN AND JANE DOE DEFENDANTS 4–30, | SECOND AMENDED CLASS ACTION COMPLAINT |
| *Defendants*. | |

### INTRODUCTION

Plaintiff Kimario Anderson ("Plaintiff"), individually and on behalf of the Coca-Cola Bottlers' Association 401(k) Retirement Savings Plan (the "Plan") and a class of similarly situated participants in and beneficiaries of the Plan, brings this class action pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), against the Plan's fiduciaries, including the Coca-Cola Bottlers' Association ("CCBA"), The Coca-Cola Bottlers Association 401(k) Savings Plan Benefit Committee, Stephanie R. Griffin, Ann Burton, Suzy Higginbotham, John Gould, and John and Jane Does 1–30 (collectively "Defendants") for breaches of their fiduciary duties.

Plaintiff brings this action by and through his undersigned attorneys based upon personal knowledge, information contained in the Plan's Summary Plan Description ("SPD"), the Plan's publicly available Form 5500 series filings with the United States Department of Labor, the

account information and statements provided to him as a participant in the Plan, and other information publicly available or obtained through counsel's preliminary investigation. Plaintiff anticipates that discovery will uncover further support for the allegations in this Complaint and, potentially, for additional claims.

As described herein, Defendants have breached their fiduciary duties to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries. Plaintiff brings this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA. Plaintiff brings this action and requests this relief for the benefit of the Plan and its participants and beneficiaries. In support of his claims, Plaintiff states and alleges as follows:

### NATURE OF THE CASE

1.      This is a civil enforcement action brought on behalf of the Plan pursuant to the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA").

2.      This class action concerns the Plan and is brought on behalf of all persons who were and/or are participants in and beneficiaries of the Plan at any time during the six-year period preceding the filing of the original Complaint and up through the present (the "Class Period").

3.      Defendants were fiduciaries of the Plan during the Class Period.

4.      Defendants were responsible for selecting, monitoring, and removing investment options made available to the Plan participants, as well as controlling and accounting for expenses of the Plan.

5.      The fiduciary obligations of plan fiduciaries to the participants and beneficiaries of an ERISA-governed plan are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598, 602 (8th Cir. 2009).

6.      Fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

7.      When selecting investment options for an ERISA-governed plan, the plan's fiduciaries are required to act for the exclusive benefit of the plan and its participants and beneficiaries, perform with undivided loyalty, act prudently, defray reasonable plan expenses, diversify investments to minimize large losses unless clearly prudent not to do so, and discharge their duties in accordance with the governing documents and instruments so long as they are consistent with ERISA. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

8.      Defendants failed to fulfill these duties.

9.      During the Class Period, Defendants could have leveraged the Plan's assets to qualify for lower-cost versions of the same investments, chosen less costly and equally or better-performing investment options for the Plan, and used the Plan's size to reduce recordkeeping fees.

10.     Also, during the Class Period, Defendants included as an option the Coca-Cola Common Stock Fund (an undiversified investment) instead of well-diversified options, even though The Coca-Cola Company's common stock performed poorly in comparison to its benchmark, thereby imposing more risk on and less return for participants.

11.     Plaintiff brings this action to remedy the losses the Plan has sustained as a result of these and other fiduciary breaches by Defendants and to obtain such further equitable or remedial relief as may be appropriate to redress and to enforce the provisions of ERISA.

12.     Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed, including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized Plans, total cost comparisons to similarly-sized Plans, information regarding other available share classes, and information regarding the availability and pricing of collective trusts and separate accounts and market-rate recordkeeping costs.

13.     Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.

14.     Having never managed a large 401(k) plan such as the Plan, Plaintiff lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.

15.     Plaintiff did not and could not review the meeting minutes or other evidence of Defendants' fiduciary decision-making process, or the lack thereof.

16.     This Complaint is based upon reasonable inferences drawn from the facts set forth herein.

### THE PARTIES

17.     Defendant Coca-Cola Bottlers' Association ("CCBA") is a Georgia corporation with its headquarters located in Atlanta, Georgia.

18.     CCBA members consist of all 65 U.S. independent bottlers of Coca-Cola, as well as associate members that include bottler-owned production cooperatives.

19.     CCBA states that offers a wide array of programs for its members, including employee benefits, to "take advantage of the collective size and strength" of its membership and assist its members in reducing costs.

20.     One of the programs CCBA offers for its members is a 401(k) plan.

21.     The Coca-Cola Bottlers' Association 401(k) Retirement Savings Plan (the "Plan") is intended to be a multiple employer plan ("MEP") under 26 U.S.C. §413(c).

22.     As a sponsor and administrator of the Plan, CCBA is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

23.     More than half of CCBA's members participate in the Plan.

24.     The Plan's participants consist of current and former employees of independent companies that are members of CCBA.

25.     Defendant Coca-Cola Bottlers' Association 401(k) Retirement Savings Plan Benefit 401 (the "Committee") was appointed by CCBA to help carry out the Plan's administrative functions and to assist CCBA as the Plan Administrator.  (Doc. 14-2 at 56 (Plan Doc at 9.01)). The Committee may have up to five members, but it must include CCBA's Executive Director, Chief Financial Officer, and Manager – Retirement Services. The Committee is responsible for (1) "establishing and periodically reviewing the Policy Statement," (2) "revising investment policy . . . to reflect changing conditions with the Plan, or to refine the Policy Statement to make it more effective," (3) "determining the Plan's investment options," (4) "monitoring investment performance and compliance with [the] Policy Statement," and (5) appointing an investment consultant, if one is appointed.

26.     Defendant Stephanie R. Griffin ("Griffin"), CCBA's Senior Manager for Employee Benefits, signed the Form 5500 on behalf of the Plan Administrator and Plan Sponsor during the

Class Period and also signed the Plan's Investment Policy Statement for 2021. Griffin is a member of the Committee and therefore is part of the group that oversees and is responsible for administering the Plan.

27.     As a member of the Committee, Griffin had control over the management of the Plan and its assets, including developing and executing the Plan's Investment Policy Statement and investment policies and objectives; selecting and regularly monitoring the investment options in the Plan, including but not limited to the performance and costs of those investment options and comparing them to other better-performing or less-costly alternatives; and choosing and overseeing the Plan's third-party administrator, custodian, trustee, recordkeeper, and other service providers, monitoring their compensation, and minimizing the costs of such third-party services.

28.     Defendant Ann Burton ("Burton") was CCBA's Chief Financial Officer during all or part of the Class Period. Burton also signed the Plan's Investment Policy Statement in at least 2012, 2016, and 2018. By the nature of her title, Burton was a member of the Committee and was therefore part of the group that oversaw and administered the Plan.

29.     As a member of the Committee, Burton had control over the management of the Plan and its assets, including developing and executing the Plan's Investment Policy Statement and investment policies and objectives; selecting and regularly monitoring the investment options in the Plan, including but not limited to the performance and costs of those investment options and comparing them to other better-performing or less-costly alternatives; and choosing and overseeing the Plan's third-party administrator, custodian, trustee, recordkeeper, and other service providers, monitoring their compensation, and minimizing the costs of such third-party services.

30.     Defendant Suzy Higginbotham is CCBA's Chief Financial Officer.  By the nature of her title, Higginbotham is on the Committee and was therefore part of the group that oversaw and administered the Plan.

31.     As a member of the Committee, Higginbotham had control over the management of the Plan and its assets, including developing and executing the Plan's Investment Policy Statement and investment policies and objectives; selecting and regularly monitoring the investment options in the Plan, including but not limited to the performance and costs of those investment options and comparing them to other better-performing or less-costly alternatives; and choosing and overseeing the Plan's third-party administrator, custodian, trustee, recordkeeper, and other service providers, monitoring their compensation, and minimizing the costs of such third-party services.

32.     Defendant John Gould is CCBA's Executive Director and Chief Executive Officer. By the nature of his title, Gould was on the Committee and was therefore part of the group that oversaw and administered the Plan.

33.     As a member of the Committee, Gould had control over the management of the Plan and its assets, including developing and executing the Plan's Investment Policy Statement and investment policies and objectives; selecting and regularly monitoring the investment options in the Plan, including but not limited to the performance and costs of those investment options and comparing them to other better-performing or less-costly alternatives; and choosing and overseeing the Plan's third-party administrator, custodian, trustee, recordkeeper, and other service providers, monitoring their compensation, and minimizing the costs of such third-party services.

34.     Defendants John and Jane Does 4–30 are the other individuals who are or were members of the Committee and were or are responsible for administering the Plan.

35.     As such, Defendants John and Jane Does 4–30 are or were the individuals or part of the group that was delegated control over the management of the Plan and its assets, including developing and executing the Plan's Investment Policy Statement and investment policies and objectives; selecting and regularly monitoring the investment options in the Plan, including but not limited to the performance and costs of those investment options and comparing them to other better-performing or less-costly alternatives; and choosing and overseeing the Plan's third-party administrator, custodian, trustee, recordkeeper, and other service providers, monitoring their compensation, and minimizing the costs of such third-party services.

36.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

37.     ERISA treats as fiduciaries not only persons expressly named as fiduciaries under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.

38.     Defendants are, or during the Class Period were, fiduciaries of the Plan under ERISA.

39.     Defendants were fiduciaries of the Plan because they were so named; they exercised authority or control respecting management or disposition of the Plan's assets; they exercised discretionary authority or discretionary control respecting management of the Plan; or they had discretionary authority or discretionary responsibility in the administration of the Plan.

40.     Plaintiff Kimario Anderson ("Anderson") is a resident of Kansas.

41.     Plaintiff Anderson was employed by Heartland Coca-Cola Bottling Company, LLC ("Heartland"), a Kansas corporation.

42.     Heartland is a member of CCBA and is a participating employer in the Plan.

43.     Plaintiff Anderson participated in the Plan during the Class Period and has suffered harm as a result of Defendants' breaches of their fiduciary duties under, and violations of, ERISA.

44.     Anderson invested in at least 33 different investment options offered by the Plan during the Class Period, including many of the options specifically identified below as imprudent (including American Funds Europacific Growth R4, Wells Fargo Stable Return Fund, and Coca-Cola Common Stock Fund, among others). Accordingly, he has suffered personal injury in fact, including but not limited to injury from the imprudent menu of investment options offered in the Plan, as well as monetary injury in the form of diminution of the value of his assets in the Plan (due to excessive management fees in overpriced finds, excessive overall recordkeeping fees, and lost gains due to underperformance), as a result of Defendants' breach of their fiduciary duties of prudence and loyalty as alleged below.

45.     Plaintiff Anderson brings these claims individually and on behalf of the Plan and a class of participants in and beneficiaries of the Plan.

46.     Defendant CCBA may be served with process through its registered agent, John Gould, at 3282 Northside Parkway Suite 200, Atlanta, Georgia 30327.

47.     Defendant Griffin may be served at 317 Mirramont Ct., Woodstock, GA 30189-8219.

48.     Defendant Higginbotham may be served at 1714 Atlantic Beach Drive, Atlantic Beach, FL 32233.

49.     Defendant Gould may be served at 811 N. Island Terrace, Atlanta, GA 30327.

## JURISDICTION AND VENUE

50.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

51.     Plaintiff received and expected to receive his benefits from the Plan in Kansas.

52.     Plaintiff participates in the Plan through his Kansas employer, Heartland.

53.     Defendants solicited Heartland's membership and communicated information about the Plan to Heartland in Kansas.

54.     Defendants continue to communicate Plan information to Heartland and other employer sponsors in Kansas.

55.     Defendants communicated information about the Plan to Plaintiff in Kansas.

56.     ERISA provides for nationwide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

57.     The Court has personal jurisdiction over this case, and venue is proper in this District.

58.     The Court also has personal jurisdiction over Defendants pursuant to Fed. R Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Kansas.

## ERISA'S FIDUCIARY STANDARDS

59.     To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty, prudence, diversification, and compliance with the plan document upon plan

fiduciaries. 29 U.S.C. § 1104(a)(1). These fiduciary duties apply to Defendants because they are

fiduciaries of the Plan.

60.     ERISA § 404(a)(1), 29 U.S.C.§ 1104(a)(1), imposes a "prudent person" standard

of care on plan fiduciaries:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest
> of the participants and beneficiaries and—
>
> (A)     for the exclusive purpose of:
>
>> (i)     providing benefits to participants and their beneficiaries; and
>> (ii)     defraying reasonable expenses of administering the plan;
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then
> prevailing that a prudent man acting in a like capacity and familiar with such
> matters would use in the conduct of an enterprise of like character and with like
> aims;
>
> (C)     by diversifying the investments of the plan so as to minimize the risk of
> large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D)     in accordance with the documents and instruments governing the plan
> insofar as such documents and instruments are consistent with the provisions of this
> title and title IV.

61.     ERISA also imposes co-fiduciary duties on plan fiduciaries. ERISA § 405, 29

U.S.C. § 1105, states in relevant part that:

> In addition to any liability which he may have under any other provision of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act
> or omission of such other fiduciary, knowing such act or omission is a
> breach;
> (2)     if, by his failure to comply with section 404(a)(1) in the administration of
> his specific responsibilities which give rise to his status as a fiduciary, he
> has enabled such other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he makes
> reasonable efforts under the circumstances to remedy the breach.

62.     Under ERISA, fiduciaries who exercise discretionary authority or control over the selection of plan investments must act prudently and solely in the interest of participants and beneficiaries of the plan.

63.     Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings 401(k) Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

64.     Indeed, fiduciary decisions may dramatically affect the amount of money participants save for retirement.

65.     For example, an illustration from the Department of Labor shows that a 1% difference in fees over a person's career makes a 28% difference in retirement savings. U.S. Dept. of Labor, *A Look at 401(k) Plan Fees*, at 2 (Sept. 2019).

66.     An ERISA fiduciary has a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015). Prudence requires a review at "regular intervals." *Id.* at 1828.

67.     As the Department of Labor explains:

[T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

68.     A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries, as the Department of Labor has explained:

[T]he Department has construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to participants and beneficiaries, as prohibiting a fiduciary from subordinating the interests of

participants and beneficiaries in their retirement income to unrelated objectives. In other words, in deciding whether and to what extent to invest in a particular investment, or to make a particular fund available as a designated investment alternative, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment, or to designate an investment alternative, may not be influenced by non-economic factors unless the investment ultimately chosen for the plan, when judged solely on the basis of its economic value, would be equal to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988).

69.    In a separate publication, the Department of Labor further explains:

The Federal law governing private-sector plan, the Employee Retirement Income Security Act (ERISA), requires that those responsible for managing a plan – referred to as fiduciaries – carry out their responsibilities prudently and solely in the interest of the plan's participants and beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable.

. . . .

Plan fees and expenses are important considerations for all types of plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

. . . .

By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

U.S. Dep't of Labor Emp. Benefits Sec. Admin., *Understanding Retirement Plan Fees and Expenses* 1–2, 4 (2011).

## GENERAL ALLEGATIONS

70.     The Plan is a "defined contribution" plan under ERISA.

71.     A defined contribution plan is a type of retirement plan in which the employer, employee, or both make contributions on a regular basis, individual accounts are set up for participants, and benefits are based on the amounts credited to these accounts (through employee contributions and, if applicable, employer contributions), plus any investment earnings on the money in the account.

72.     In a defined contribution plan, each participant has an individual account and directs plan contributions into one or more investment alternatives in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

73.     Plan expenses can "significantly reduce the value of an account in a defined-contribution plan." *Id*.

74.     The fees assessed to participants are generally attributable to two types of services: plan administration and investment management.

75.     The Plan's fiduciaries have control over these expenses.

76.     The fiduciaries are responsible for hiring administrative service providers and negotiating and approving their compensation.

77.     The fiduciaries also have exclusive control over the menu of investment alternatives available to plan participants. The investment alternatives each have their own fees, typically expressed as a percentage of assets under management, or expense ratio. If, for example, a fund charges 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis

points. The fees deducted from a fund's assets reduce the value of the shares, and thus reduce the returns participants receive on their investments.

78.     These fiduciary decisions have the potential to dramatically affect the amount of money plan participants are able to save for retirement.

79.     Fiduciaries must engage in a rigorous process to control costs and ensure that participants pay no more than a reasonable level of fees.

80.     This is particularly true for large plans, which have the bargaining power to obtain the lowest fees.

81.     Contributions to the Plan are made in the form of salary deferral contributions by individual employee participants, through the participant's employer in the form of employer matching contributions, and through profit-sharing contributions.

82.     Participants' contributions vest immediately and safe harbor matching and profit-sharing contributions vest 100% after two years of service.

83.     Defendants selected and retained various investment options made available to participants in the Plan and chose the recordkeeper for the Plan.

84.     At the choice and discretion of Defendants, various investment options are made available to participants in the Plan.

85.     As of December 31, 2018, for example, the Plan included 24 investment options: 22 mutual funds; one collective investment trust fund; and a Coca-Cola Common Stock Fund.

86.     By December 31, 2018, the Plan had more than 19,000 participants and managed more than $650,000,000 in total assets, approximately $540,000,000 of which was invested in mutual funds.

87.     According to the Plan's 2019 Form 5500, as of December 2019 the Plan had more than $799,000,000 in net assets.

88.     Based on the most recent data available to Plaintiff, the Plan would be in the top 0.1% of all 401(k) plans based on size, in terms of both plan assets and number of plan participants.

89.     A "'multiple employer plan' can refer to a variety of different kinds of employee-benefit arrangements," including sponsorship of a defined contribution retirement plan by "a group or association of employers." 84 Fed. Reg. 37508, 37512 (July 31, 2019).

90.     "Grouping small employers together into a MEP" in this way can "facilitate savings through administrative efficiencies" and "price negotiation." *Id.* at 37533.

91.     MEPs achieve economies of scale of large plans that provide a "distinct economic advantage[]" of lower administrative costs for individual employers. *Id.*

92.     MEPs create cost efficiencies in at least two ways: "First, as scale increases, marginal costs for MEPs . . . diminish and MEPs . . . spread fixed costs over a larger pool of member employers and employee participants, creating direct economic efficiencies. Second, larger scale may increase the negotiating power of MEPs." *Id.*

93.     MEPs operating as a large single plan can secure lower-cost administrative services from service providers.

94.     Because the Plan is a MEP, it is a single Plan with a single Plan document that all participating employers must agree to and cannot alter.

95.     Furthermore, the Plan files a single Form 5500 with the Department of Labor.

96.     Because of the Plan's size, CCBA had, and continues to have, the ability to choose investment options not generally available and had and has significant bargaining power with

respect to the fees and expenses that were charged against participants' investments and the fees and expenses charged for recordkeeping services.

97.     Indeed, as CCBA itself recognizes on its website promoting its 401k plan: "**In 401k Plan pricing, size is power; and this Plan is massive.**" *The Coca-Cola Bottlers' Association Defined Contribution Plan (401k)* (last visited Mar. 9, 2021), https://ccbanet.com/programs/ employee-benefits/defined-contribution-plan-401k/.

98.     But, as described below, Defendants did not take advantage of this leverage and bargaining power, nor did they take appropriate actions to reduce the Plan's investment and recordkeeping expenses, or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent. The Plan paid and charged to participants fees that were far in excess of what the Plan could have obtained without sacrificing the quality of the Plan's services or investments.

### *Defendants Failed to Properly Investigate and Select Lower Cost Investment Options for Plan Participants.*

99.     As the Plan's fiduciaries, Defendants must engage in a prudent and loyal process to select, monitor, remove, and retain Plan investment options.

100.     As noted above, under 29 U.S.C. § 1104(a)(1), Defendants must provide diversified investment options for the Plan. But diversification is not the only consideration for a prudent and loyal fiduciary.

101.     ERISA also requires Defendants to evaluate and monitor the fees and costs associated with the Plan's investment options, and to give substantial consideration to those fees and costs when determining which options to remove or retain.

102.     As explained below, Defendants failed to offer Plan participants similar investment options to those in the Plan that were less costly and better performing, failed to take advantage of

savings offered by lower cost share classes of mutual funds already in the Plan, and failed to consider investment vehicles with lower fees than those in the Plan, such as collective trusts (also called "collective investment trusts" and "collective trust funds"), commingled accounts, and separate accounts.

103.    As a result of Defendants' systemic failure to properly investigate and select lower cost investment options for Plan participants (as explained in detail below), nearly the entire menu of investment options was overpriced compared to the other options (lower price share classes of the same funds; lower price substantially similar alternative investments; and lower price CIT versions of identical mutual funds) that prudent and loyal fiduciaries would have selected for the benefit of the Plan and its participants.

| Year | Total Funds in Plan | Overpriced Funds in Plan | % Overpriced Funds in Plan |
|------|------|------|------|
| 2015 | 25 | 16 | 64% |
| 2016 | 24 | 20 | 83% |
| 2017 | 24 | 21 | 88% |
| 2018 | 24 | 22 | 92% |

104.    Had Defendants fulfilled their duties under ERISA and engaged in a prudent and loyal process to select, monitor, retain, and remove investment options from the Plan, these failures would not have occurred.

105.    Defendants' actions were contrary to the actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

106.    Defendants failed to follow the requirements of their Investment Policy Statements.

***Defendants Imprudently Retained Investment Options in the Plan Despite the Availability of Similar, Lower-Cost, Better-Performing Options***.

107.    "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act § 7.

108.    Defendants' duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.

109.    Costs not paid by the employer, such as administrative, investment, legal, and compliance costs, are effectively paid by plan participants.

110.    The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, which sort investments of all kinds into categories based on the underlying securities in each portfolio.

111.    ERISA-mandated monitoring of investments leads prudent and impartial plan fiduciaries to continually evaluate performance and fees, resulting in great competition among investment providers in the marketplace.

112.    Prudent and impartial plan sponsors should be monitoring both the performance and cost of the investments selected for 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

113.    Defendants failed to consider and select lower cost investment options that were similar to or in the same investment style as those being offered in the Plan.

114.    For example, Defendants should have realized that the T. Rowe Price target date mutual funds were directing a substantial portion of their assets into the proprietary T. Rowe Price

Equity Index 500 fund, which charged a fee that Morningstar called "outrageous":

> Target-date managers can better serve investors by using cheap options when selecting underlying index funds. There are over 40 large-cap passive options used within target-date funds, ranging from large-value to equally weighted indexes, but most reside in the large-blend Morningstar Category and track the S&P 500. Despite near identical objectives, prices vary. Fees range from cheap—Schwab and State Street both charged 0.03% on their U.S. large-cap index offerings—to simply outrageous—MainStay offers its MainStay S&P 500 Index for 0.35% and T. Rowe Price charges 0.25% for T. Rowe Price Equity Index 500, which has $27 billion in assets.

Morningstar 2017 Target-Date Fund Landscape Report (Apr. 21, 2017).

115.    Thus, Defendants served up target date funds that, for at least part of the Class Period, directed a substantial portion of their assets to an S&P 500 fund that charged more than seven times the market rate.

116.    Moreover, Defendants designated the target date funds as the Plan's Qualified Default Investment Alternative ("QDIA")—the investment used when an employee contributes to the Plan without having specified how the money should be invested—during the Class Period. By selecting the target date funds as the Plan's QDIA, Defendants drove even more participant money to those unnecessarily expensive investment options.

117.    The chart below sets forth examples of various Plan investment options, and how much more expensive they were compared to substantially similar alternative investment options that were available to the Plan (using, as an example, 2018 expense ratios):

| In Plan/ Similar Low Fee Alternatives | Investment Option | Expense Ratio | % In-Plan Fee Exceeds Alternative Low Fee |
|---|---|---|---|
| In Plan | T. Rowe Price Retirement 2030 (TRRCX) | 0.67% | |
| Low Fee Alternative | State Street Target Retirement 2030 K (SSBYX) | 0.09% | 644.44% |
| | | | |

| | | | |
|---|---|---|---|
| In Plan | T. Rowe Price Retirement 2040 (TRRDX) | 0.72% | |
| Low Fee Alternative | State Street Target Retirement 2040 K (SSCQX) | 0.09% | 700% |
| | | | |
| In Plan | T. Rowe Price Retirement 2050 (TRRMX) | 0.72% | |
| Low Fee Alternative | State Street Target Retirement 2050 K (SSDLX) | 0.09% | 700% |
| Low Fee Alternative | TLLPX TIAA-CREF Lifecycle Index 2050 Premier (TLLPX) | 0.25% | 188% |
| | | | |
| In Plan | T. Rowe Price Retirement 2060 (TRRLX) | 0.72% | |
| Low Fee Alternative | State Street Target Retirement 2060 K (SSDYX) | 0.09% | 700% |
| Low Fee Alternative | TIAA-CREF Lifecycle Index 2060 Premier (TVIPX) | 0.25% | 188% |
| | | | |
| In Plan | Mainstay Large Cap Growth (MLAIX) | 0.75% | |
| Low Fee Alternative | Vanguard U.S. Growth Fund Admiral (VWUAX) | 0.30% | 150% |
| | | | |
| In Plan | Hartford Midcap R5 (HFMTX) | 0.86% | |
| Low Fee Alternative | Vanguard Mid-Cap Growth Index Admiral (VMGMX) | 0.07% | 1128.57% |
| Low Fee Alternative | Bridge Builder Small/Mid Growth (BBGSX) | 0.42% | 104.76% |
| | | | |
| In Plan | American Funds Balanced R4 (RLBEX) | 0.63% | |
| Low Fee Alternative | Vanguard Balanced Index I (VBAIX) | 0.06% | 950% |
| | | | |
| In Plan | American Funds Europacific Growth R4 (REREX) | 0.83% | |
| Low Fee Alternative | VWILX Vanguard Int'l Growth Admiral | 0.32% | 159.38% |
| | | | |
| In Plan | Goldman Sachs Small Cap Value Inst. (GSSIX) | 0.94% | |
| Low Fee Alternative | Vanguard Small Cap Index (VSCIX) | 0.04% | 2,250% |

118.     The low fee investment option alternatives listed in the chart above performed comparably with or better than, and in some cases significantly better than, their comparable option in the Plan.

119.     The expense ratios for the in-plan and substantially similar alternative investment options in the other years of the Class Period were similar to those in 2018 (which are provided simply as a specific illustration).

120.     The substantially similar, but lower-cost, alternative investment options in the chart above were identified using an industry recognized software program that uses quantitative methods, such as returns-based and holdings-based correlation analysis, to find funds that are highly similar to the fund being analyzed, resulting in an "apples-to-apples" comparison.

121.     A prudent and loyal fiduciary would not have selected investment options that were significantly more expensive, but performed no better (or significantly worse), than substantially similar alternative investment options. No reasonable, prudent justification exists for Defendants' failure to do so.

### *Defendants Failed to Take Advantage (or to Timely Take Advantage) of Lower Cost Share Classes of the Mutual Funds in the Plan.*

122.     Beyond their failure to properly monitor the Plan's investment options and offer substantially similar alternative options that cost substantially less (and performed better), Defendants also failed to take advantage of lower-cost shares and utilize lower-cost CIT versions of the investment options they did offer.

123.     Larger asset balances in 401(k) plans lead to economies of scale and special pricing within mutual funds and other investment products.

124.     Larger 401(k) plans should have significantly lower asset-weighted average expense ratios than smaller plans.

125.    The Plan's expense ratios were multiples of what they should have been given the bargaining power available to Defendants.

126.    For example, many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors with more expensive share classes generally targeted at smaller investors with less bargaining power, while lower cost shares are targeted at "institutional investors" with more assets (generally, $1 million or more) and therefore greater bargaining power.

127.    Typically, there is no difference between share classes other than cost—*i.e.*, the funds hold identical investments and have the same manager.

128.    Fiduciaries must consider the size and purchasing power of their plan in selecting share classes or alternative investments.

129.    It is a foundational investment management principle that an investor with a larger amount to invest can expect to negotiate lower fees.

130.    Large defined contribution plans, such as the Plan, qualify for lower-cost share classes and alternative investments because of their size and purchasing power.

131.    A fiduciary's "duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule." Restatement (Third) of Trusts ch. 17, intro. note (2007); *Tibble*, 135 S. Ct. at 1828 (relying on Restatement (Third) of Trusts to interpret ERISA).

132.    Prudent fiduciaries will search for and select the lowest-priced share class available.

133.    During the Class Period, Defendants failed to offer the lowest cost share class of mutual funds available to the Plan.

134.    No reasonable, prudent justification exists for Defendants' failure to offer the lowest cost share class available for the mutual funds in the Plan.

135.    Based on data and information from industry sources, even if there was any revenue sharing from some of these funds, any such revenue sharing would have been limited to only some of the funds at issue; and, even for any funds in which there was revenue sharing, the revenue sharing from those funds would not have been sufficient to fully offset or otherwise justify the significantly higher expenses charged by the share classes Defendants selected for inclusion in the Plan versus the lower-priced share classes available based on the size of the Plan.

136.    At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes of the mutual funds in the Plan and thus also should have promptly identified the prudence of transferring the Plan's funds into these lower cost share classes.

137.    Yet, even though the Plan's size and scale made it possible for the fiduciaries to select identical lower cost share counterparts much earlier during the Class Period, Defendants repeatedly failed to take action to utilize the Plan's "massive" scale.

138.    As demonstrated by the chart below, Defendants failed to ensure that the Plan was invested in the lowest-cost share class available for the Plan's mutual funds and did not promptly switch to these lower cost alternatives when they became available.

139.    The following chart provides an example of how much more expensive the funds in the Plan were than their identical, lower-cost counterparts (using 2018 expense ratios):

| Fund in Plan | 2018 Expense Ratio | Lower Cost Share Class | 2018 Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| American Funds American Balanced R4 (RLBEX) | 0.63% | American Funds American Balanced R6 (RLBGX) | 0.28% | 125% |

| | | | | |
|---|---|---|---|---|
| American Funds Europacific Growth R4 (REREX) | 0.83% | American Funds Europacific Growth R6 (RERGX) | 0.49% | 69% |
| Columbia Dividend Income A (LBSAX) | 0.96% | Columbia Dividend Income Inst (CDDYX) | 0.58% | 66% |
| Fidelity Small Cap Growth (FCPGX) | 1.02% | Fidelity Small Cap Growth Inst. (FIDGX) | 0.90% | 13% |
| Hartford MidCap R5 (HFMTX) | 0.86% | Hartford MidCap R6 (HFMVX) | 0.76% | 13% |
| Invesco Developing Markets Y (ODVYX) | 1.05% | Invesco Developing Markets Inst. (ODVIX) | 0.87% | 21% |
| JPMorgan Mid Cap Value I (JMVSX) | 0.98% | JPMorgan Mid Cap Value Inst (FLMVX) | 0.75% | 31% |
| MainStay Winslow Large Cap Growth I (MLAIX) | 0.74% | MainStay Winslow Large Cap Growth R6 (MLRSX) | 0.63% | 17% |
| Metropolitan West Total Return Bd M (MWTRX) | 0.67% | Metropolitan West Total Return Bd Inst. (MWTIX) | 0.45% | 49% |

| MFS Value R4 (MEIJX) | 0.58% | MFS Value R6 (MEIKX) | 0.48% | 21% |
|---|---|---|---|---|
| Principal Global Real Estate Sec Inst. (POSIX) | 0.94% | Principal Global Real Estate Sec R6 (PGRSX) | 0.88% | 7% |
| T. Rowe Price Growth Stock (PRGFX) | 0.67% | T. Rowe Price Growth Stock Inst. (PRUFX) | 0.52% | 29% |
| Wells Fargo Stable Return Fund Class N35 | 0.76% | Wells Fargo Stable Return Fund Class N | 0.41% | 85% |

140.     The following chart provides an example of how much more expensive the funds in the Plan were than their identical, lower-cost counterparts (using 2017 expense ratios):

| Fund in Plan | 2017 Expense Ratio | Lower Cost Share Class | 2017 Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| American Funds American Balanced R4 (RLBEX) | 0.64% | American Funds American Balanced R6 (RLBGX) | 0.29% | 121% |
| American Funds Europacific Growth R4 (REREX) | 0.85% | American Funds Europacific Growth R6 (RERGX) | 0.50% | 70% |
| Columbia Dividend Income A (LBSAX) | 0.98% | Columbia Dividend Income Inst (CDDYX) | 0.59% | 66% |

| | | | | |
|---|---|---|---|---|
| Fidelity Small Cap Growth (FCPGX) | 1.09% | Fidelity Small Cap Growth Inst. (FIDGX) | 0.91% | 20% |
| Hartford MidCap R5 (HFMTX) | 0.86% | Hartford MidCap R6 (HFMVX) | 0.76% | 13% |
| Invesco Developing Markets Y (ODVYX) | 1.07% | Invesco Developing Markets Inst. (ODVIX) | 0.88% | 22% |
| JPMorgan Mid Cap Value I (JMVSX) | 0.99% | JPMorgan Mid Cap Value Inst (FLMVX) | 0.75% | 32% |
| MainStay Winslow Large Cap Growth I (MLAIX) | 0.74% | MainStay Winslow Large Cap Growth R6 (MLRSX) | 0.62% | 19% |
| Metropolitan West Total Return Bd M (MWTRX) | 0.67% | Metropolitan West Total Return Bd Inst. (MWTIX) | 0.44% | 52% |
| MFS Value R4 (MEIJX) | 0.59% | MFS Value R6 (MEIKX) | 0.49% | 20% |
| Principal Global Real Estate Sec Inst. (POSIX) | 0.90% | Principal Global Real Estate Sec R6 (PGRSX) | 0.88% | 2% |
| T. Rowe Price Growth Stock (PRGFX) | 0.68% | T. Rowe Price Growth Stock Inst. (PRUFX) | 0.52% | 31% |

| Wells Fargo Stable Return Fund Class N35 | 0.69% | Wells Fargo Stable Return Fund Class N | 0.34% | 103% |
|---|---|---|---|---|

141.    The expense ratios for the Plan funds and the lower-cost share classes of the same funds in 2015 and 2016 were similar to those reflected in the tables above for 2017 and 2018.

142.    No prudent, loyal reason exists for not having offered, or for not having switched and more promptly offered Plan participants lower-cost share classes of the same fund.

143.    Had Defendants engaged in a prudent, loyal process to select, monitor, retain, and remove investment options from the Plan, they would have utilized the lower-cost share classes of the mutual funds in the Plan. Defendants' failure in this regard caused the Plan and its participants to pay millions of dollars in unnecessary fees. Apparently recognizing this, but years later than a prudent fiduciary would have, in 2019 Defendants finally moved some of the funds in the Plan to available lower price share classes.

144.    Failing to move funds in the Plan to available lower price share classes before 2019 shows that Defendants did not employ a prudent, loyal process to select, monitor, remove, and retain investment options.

145.    In 2018, Defendants amended the Investment Policy Statement to say, "The Committee believes that participants should have access to low-priced investment options. Where available, the Committee will offer funds with no additional revenue sharing (institutional pricing) or 12b-1 fees. Where this is not available or not beneficial to the participant, the Committee has instructed the recordkeeper to collect these fees and to rebate them as soon as administratively feasible to the participants using those funds." In 2019, Defendants discontinued some of the more expensive share class versions of the funds and replaced them with the lower cost institutional

versions or lower cost similar funds. When this occurred, Plan participants' balances were automatically transferred to the lower cost institutional versions or lower cost similar funds. Defendants thus acknowledge by their actions that these lower priced institutional versions of the investments and lower cost similar funds (whether structured as a collective investment trust or a mutual fund) were beneficial to the participants. A prudent fiduciary would have recognized and done this all along.

### *Defendants Failed to Offer the Collective Trust Version of the T. Rowe Price Target Date Mutual Funds in the Plan, Costing Plan Participants Significantly More in Fees for an Identical Product.*

146.    Plan fiduciaries must be continually mindful of the types of investment options available to ensure they do not unduly risk plan participants' savings or charge unreasonable fees.

147.    Defendants' own Investment Policy Statements required that they review expense ratios for "similar investments," but they failed to follow this requirement.

148.    For the majority of the Class Period, Defendants did not utilize the Plan's assets to substantially reduce fees by moving assets from mutual funds to lower-cost institutional vehicles, like collective investment funds or separate accounts, that provided an identical product.

149.    Like mutual funds, collective investment trusts ("CITs" or "collective trusts") pool plan participants' investments, but can provide an even lower fee alternative compared to I-share classes of mutual funds.

150.    Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds, and cash, and are not available to the general public.

151.    Regulated by the Office of the Comptroller of the Currency, rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements and cannot advertise or issue formal prospectuses.

152.    Unlike with mutual funds, many collective trust managers are fiduciaries and are subject to ERISA fiduciary standards, *i.e.*, they must manage the CIT accounts solely in the plan participants' interest, which is a benefit to plan participants who invest in CITs.

153.    Collective trusts are also subject to state and federal banking regulations that provide comparable protections to the Investment Company Act.

154.    To state it another way, collective trusts are subject to robust regulations, but do not have to be registered with the Securities and Exchange Commission because, unlike mutual funds, they are not a retail product available to the general public.

155.    Collective trusts thus can have much lower costs than mutual funds, with less or no administrative costs and less or no marketing or advertising costs.

156.    Retirement plans have used alternatives to mutual funds, such as collective trusts, for decades.

157.    Collective trusts contract directly with 401(k) plans and provide regular reports regarding costs and investment holdings.

158.    Collective trusts use a unitized structure, and the units are valued daily.

159.    As a result, participants invested in collective trusts can track the daily performance of their investments online.

160.    Since at least 2012, the Plan's Investment Policy Statement has recognized the propriety of including collective trusts as investment options in the Plan: "Participants will be allowed to invest in mutual funds, common or collective trust funds, and other investments that the Committee deems appropriate."

161.    Since at least 2014, the Plan utilized a collective trust—the Wells Fargo Stable Value N35 fund—as an investment option.

162.    Defendants thus did not have concerns about the regulatory and transparency features of collective trusts.

163.    Many if not most mutual fund strategies are available in collective trust format, and in such instances the investments in the collective trusts are identical to those held by the mutual fund.

164.    "[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble*, 843 F.3d at 1998.

165.    The T. Rowe Price Retirement Trusts collective trust is substantially identical—other than their lower cost—to the mutual fund-based T. Rowe Price Retirement Funds target-date series.

166.    The T. Rowe Price Retirement Trusts collective trust has the same portfolio management team, glidepath, subasset-class exposure, tactical allocation overlay and underlying investments as the mutual fund-based T. Rowe Price Retirement Funds target-date series.

167.    At all times during the Class Period, had Defendants utilized a prudent process and been properly discharging their duties for the exclusive benefit of the participants and allowing the participants to be charged only reasonable fees, Defendants would have known or should have known of the existence of the same target date investment in the lower-cost collective trust offering and should therefore have promptly identified the prudence of transferring the Plan's funds into these lower cost alternative investments.

168.    Despite the clear cost advantages of the collective trusts listed below, Defendants' process failed to consider the alternative of collective trust offerings, and Defendants failed to promptly switch to the lower cost version of the same investment.

169.     As the Eighth Circuit recently found in *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020), a fiduciary's failure to switch (or timely switch) to cheaper identical funds raises "plausible" "inferences of mismanagement" that the fiduciary either "failed to negotiate aggressively enough" or was simply "asleep at the wheel":

> The complaint alleges that the marketplace for retirement plans is competitive, and with $3.8 billion invested, WashU's "pool of assets" is large. From these facts, two inferences of mismanagement are plausible from WashU's failure to offer more institutional shares. The first is that it failed to gain access to them because, as the complaint alleges, it did not negotiate aggressively enough with Vanguard. The second is that it was asleep at the wheel: it failed to pay close enough attention to available lower-cost alternatives. Either way, a "failure of effort [or] competence" is enough to state a claim for breach of the duty of prudence.

170.     Likewise here, because the marketplace for retirement plans is competitive and the Plan's pool of assets is large, it is plausible and indeed reasonable to infer that Defendants were "asleep at the wheel" or "did not negotiate aggressively enough" and are guilty of a "failure of effort or competence" and failure to act with the "immediacy" that ERISA requires. *Davis*, 960 F.3d at 483.

171.     In simple terms, Defendants failed to timely switch to an investment option that was the same investment in a different wrapper at a much lower price, and this failure reveals that Defendants did not prudently monitor the Plan's investment options and make decisions in the best interest of Plan participants.

172.     Since at least 2015, the beginning of the Class Period, Defendants could have offered the collective trust versions of the T. Rowe Price target date mutual funds in the Plan.

173.     The T. Rowe Price collective trust target date funds were less expensive than the identical mutual fund versions utilized by the Plan.

174.     Other fiduciaries of large plans were prudently paying attention and using their scale to drive down costs in this way.

175.    For example, Garmin moved from T. Rowe Price mutual funds to T. Rowe Price collective investment trusts as early as 2014.

176.    The CCBA Plan, with hundreds of millions of dollars in various investment options, easily qualified for these lower cost options.

177.    At all times during the Class Period, the Plan had enough assets in the T. Rowe Price target date mutual funds needed to qualify for the lower-cost collective trust target date fund.

178.    The following chart provides an example of how much more expensive the Plan's T. Rowe Price target date funds were than their identical collective trust counterparts in 2018:

| T. Rowe Price Target Date Fund in Plan | Expense Ratio | T. Rowe Price Lower Cost Institutional Class/Collective Trust | Expense Ratio | % Fee Excess |
|---|---|---|---|---|
| TRP RETIREMENT 2010 (TRRAX) | 0.54% | TRP RETIREMENT TRUST F 2010 | 0.43% | 26% |
| TRP RETIREMENT 2020 (TRRBX) | 0.61% | TRP RETIREMENT TRUST F 2020 | 0.43% | 42% |
| TRP RETIREMENT 2030 (TRRCX) | 0.67% | TRP RETIREMENT TRUST F 2030 | 0.43% | 56% |
| TRP RETIREMENT 2040 (TRRDX) | 0.72% | TRP RETIREMENT TRUST F 2040 | 0.43% | 67% |
| TRP RETIREMENT 2050 (TRRMX) | 0.72% | TRP RETIREMENT TRUST F 2050 | 0.43% | 67% |

| TRP RETIREMENT 2060 (TRRLX) | 0.72% | TRP RETIREMENT TRUST F 2060 | 0.43% | 67% |

179.    The following chart provides an example of how much more expensive the Plan's T. Rowe Price target date funds were than their identical collective trust counterparts in 2017 (even more expensive and a greater percentage fee excess than in 2018):

| T. Rowe Price Target Date Fund in Plan | Expense Ratio | T. Rowe Price Lower Cost Institutional Class/Collective Trust | Expense Ratio | % Fee Excess |
| --- | --- | --- | --- | --- |
| TRP RETIREMENT 2010 (TRRAX) | 0.57% | TRP RETIREMENT TRUST F 2010 | 0.43% | 33% |
| TRP RETIREMENT 2020 (TRRBX) | 0.63% | TRP RETIREMENT TRUST F 2020 | 0.43% | 47% |
| TRP RETIREMENT 2030 (TRRCX) | 0.69% | TRP RETIREMENT TRUST F 2030 | 0.43% | 60% |
| TRP RETIREMENT 2040 (TRRDX) | 0.74% | TRP RETIREMENT TRUST F 2040 | 0.43% | 72% |
| TRP RETIREMENT 2050 (TRRMX) | 0.74% | TRP RETIREMENT TRUST F 2050 | 0.43% | 72% |
| TRP RETIREMENT 2060 (TRRLX) | 0.74% | TRP RETIREMENT TRUST F 2060 | 0.43% | 72% |

180.    The expense ratios for the T. Rowe Price target date funds in the Plan and the T. Rowe Price institutional class collective trust in 2015 and 2016 were similar to those shown in the charts for 2017 and 2018.

181.    A prudent fiduciary conducting a prudent, impartial review of the Plan's investments would have identified the collective trust option and transferred the Plan's investments into the above-referenced fund collective trusts at the earliest opportunity.[1]

182.    Apparently recognizing this, but years later than a prudent fiduciary would have, in 2019 Defendants finally replaced the T. Rowe Price target date mutual funds with their equivalent collective trust counterparts.

183.    At that time, Defendants discontinued the T. Rowe Price target date mutual funds, and the Plan participants' balances in these discontinued funds were automatically transferred to the corresponding T. Rowe Price collective trust series.

184.    Thus, Defendants recognized that these collective trusts were meaningful and appropriate comparators to the mutual fund versions (which held the same underlying investments) and that these collective trusts were the prudent choice.

185.    Considering well-known industry trends, publicly available information from sources such as Morningstar and the activities of other fiduciaries, if Defendants had utilized a prudent process, then Defendants would or should have been aware at all times during the Class Period of the benefits of these lower-cost alternative investment vehicles and should have immediately switched to the prudent choice, T. Rowe Price collective trust series. No reasonable, prudent justification exists for Defendants' failure to timely make this switch.

---

[1] Moreover, not only did Defendants fail to utilize the collective trust version of these funds, they inexplicably offered the investor share classes, rather than the cheaper I-share classes, of these T. Rowe Price target date mutual funds.

186.    Instead, the Plan did not timely switch and, as a result, incurred excess fees due to Defendants' failure to adequately investigate the availability of collective trusts or separate accounts in the same investment style of mutual funds in the Plan.

187.    Because of the Plan's size, it could have reaped considerable cost savings by using collective trusts or separate accounts.

188.    Failing to incorporate (or timely incorporate) the T. Rowe Price collective trust options before 2019 shows that Defendants did not employ (or timely employ) a prudent, loyal process to select, monitor, remove, and retain investment options.

189.    Defendants' failure to monitor (or timely monitor) investment options and identify and implement (or timely identify and implement) the lowest cost alternatives during the Class Period violated ERISA and cost the Plan and its participants millions of dollars.

### *Defendants Retained the Non-Diversified Coca-Cola Common Stock Fund Despite Its Higher Risk and Underperformance.*

190.    The Plan offers a Coca-Cola Common Stock Fund, which is a single-stock fund consisting of stock of the Coca-Cola Company ("Coca-Cola").

191.    A single-stock fund has inherent concentration and non-diversification of risk.

192.    Diversification is a central requirement and focus of ERISA. Under ERISA, "diversification is so important that, in addition to the duty of diversification imposed by the duty of prudence, ERISA also codifies a freestanding duty of diversification, 29 U.S.C. § 1104(a)(1)(C) . . . ." *Stegemann v. Gannett Co., Inc.*, 970 F.3d 465, 475 (4th Cir. 2020).

193.    "[S]ingle-stock funds are, by definition, not diversified," and courts have observed that such funds "would seem generally imprudent for ERISA purposes." *Difelice v. U.S. Airways, Inc.*, 497 F.3d 410, 424 (4th Cir. 2007) (emphasis omitted).

194.    The Coca-Cola Common Stock Fund included in the Plan does not qualify for

Employee Stock Ownership Plan ("ESOP") status under ERISA.

195.    CCBA's members, and thereby participating employers in the Plan, are independent bottling companies.

196.    CCBA and its members, and their respective employees, are not employed by Coca-Cola.

197.    The Plan's Coca-Cola Common Stock Fund is not an employer security.

198.    Because the Plan is not an ESOP, and the Coca-Cola Common Stock Fund is not an employer security, Defendants, in addition to their statutory duty of loyalty and prudence, had an explicit statutory duty to diversify each of the Plan's investments. *See* ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C).

199.    The fiduciary must consider each available fund "on its own," and each fund must be prudent. "[A] fiduciary cannot free himself from his duty to act as a prudent [person] simply by arguing that other funds, which individuals may or *may not* elect to combine with a company stock fund, could theoretically, in combination, create a prudent portfolio." *Difelice*, 497 F.3d at 423.

200.    The Coca-Cola Common Stock Fund is not prudent or diversified as required by ERISA.

201.    As early as 2005, Defendants recognized that the Coca-Cola Common Stock Fund "may not be a suitable option for retirement savings" based on "market studies and investor behavior."

202.    Recognizing the imprudence of the non-diversified Coca-Cola Common Stock Fund as a suitable option for retirement savings, Defendants "froze" the fund and did not allow Plan participants to make new contributions or purchases into the fund. However, Defendants imprudently allowed participants to retain their previous investments in this fund, in a total amount

of up to $54 million.

203.    As a single stock fund, the Coca-Cola Common Stock Fund was inherently unduly risky because it put all the eggs in one basket, and thus violated the fiduciary duties of prudence and diversification.

204.    Despite recognizing the imprudence of this fund as a suitable option for retirement savings, Defendants admit that the reason they permitted new participants who joined the Plan to retain their previous investments in the Coca-Cola Common Stock Fund was because of CCBA's members' business partnerships with the Coca-Cola Company.

205.    Defendants thus put the business interests of CCBA and its members ahead of the interests of Plan participants, thereby breaching their fiduciary duty of loyalty, in addition to their duties of prudence and diversification.

206.    The fact that Defendant's monitoring and retention process (which Plaintiff did not and does not have actual knowledge of) resulted in retaining this inherently riskier, non-diversified fund gives rise to a plausible and indeed reasonable inference that Defendant's process was not prudent.

207.    The Department of Labor explained what a prudent process might look like:

[T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

208.    But, in fact, Defendants' process resulted in an inherently riskier non-diversified investment that had *far worse* results than the benchmark selected by the Plan.

209.    On the statements sent out by the Plan, the benchmark index used for the Coca-Cola Common Stock Fund was the S&P 500 Index.

210.    The Coca-Cola Common Stock Fund had a return that was less than half of this Plan-selected benchmark over the one-, five-, and ten-year periods ending June 30, 2020, as reflected on Plaintiff's own statement ending the same date, while continually subjecting participants in the Coca-Cola Common Stock Fund to the risk of large losses.

211.    According to Morningstar, from January 29, 2015, through February 26, 2021, while the Coca-Cola Common Stock (with dividends)[2] had a return of 41.64%, the benchmark Fidelity 500 Index Fund (FXAIX) had a return of 112.96%. To put this in real dollar terms, this means that if a participant invested $10,000 in the Fidelity 500 Index Fund instead of the Coca-Cola Common Stock on Jan 29, 2015, the participant would now have $7,000 more in the participant's 401(k) account, while taking less risk.

212.    The inherently risker, non-diversified Coca-Cola Common Stock Fund reduced Plan participants' retirement benefits because retaining the fund caused Plan participants to forgo other investment opportunities and options that would have provided Plan participants with higher returns and less risk.

213.    Because of CCBA's members' business partnerships with the Coca-Cola Company, CCBA and the other Defendants had a conflict and placed the interests of CCBA members and/or the Coca-Cola Company ahead of Plan participants and beneficiaries.

214.    This imprudent, disloyal, and non-diversified investment resulted in Plan participants losing out on millions of dollars in additional retirement savings.

215.    No prudent and loyal reason for including and retaining this non-diversified,

---

[2] The performance of Coca-Cola Common Stock with dividends, as reported by Morningstar, should be materially similar to the performance of the Coca-Cola Common Stock Fund itself.

underperforming single-stock fund as an investment option in the Plan exists, and doing so was imprudent and is evidence of an imprudent and disloyal decision-making process.

### Defendants' Relationship with Wells Fargo

216.    Wells Fargo Bank, N.A. ("Wells Fargo") acted as the Plan's recordkeeper during the Class Period.

217.    For part of the Class Period, Wells Fargo's affiliate, Wells Fargo Advisors, served as a third-party advisor to the Plan and was paid $68,939 out of Plan assets for its services.

218.    While Wells Fargo Advisors was providing advice to the Plan, the Plan's investment options included three Wells Fargo funds.

219.    Plan participants invested more than $35 million in these three Wells Fargo funds, further enriching Wells Fargo through the additional management fees on these funds.

220.    Thereafter and throughout the Class Period, Defendants retained the Wells Fargo Stable Return Fund in the Plan as an investment option, even though there were cheaper and better-performing stable value options available.

221.    Because Defendants' retained the Wells Fargo Stable Return Fund in the Plan, Plan participants invested in that Fund would have paid fees to Wells Fargo in addition to what the Plan was already paying Wells Fargo for recordkeeping.

222.    Plan participants invested millions in the Wells Fargo Stable Return Fund, consistently making it one of the largest funds in the Plan's line-up and generating even more fees for Wells Fargo.

223.    For example, as of December 31, 2015, participants invested over $23 million in the Wells Fargo Stable Return Fund, making it the single largest non-target date fund in the line-up.

40

224.    The Wells Fargo Stable Return Fund was still the largest non-target date fund in the Plan as of December 31, 2019, holding well over $49 million of Plan participant's retirement savings.

225.    Even though the Wells Fargo Stable Return Fund Class N has been available since October 1, 1985, at a cost of 41 basis points, the Plan was using the Wells Fargo Stable Return Fund Class N35 during the Class Period at a cost of approximately 76 basis points—more than 85% more expensive than its identical Class N counterpart.

226.    Moreover, as of fourth quarter 2016, the Wells Fargo Stable Return Fund Class N35 had long been underperforming compared to its peer group.

227.    As of December 31, 2017, the Wells Fargo Stable Return Fund Class N35 remained in the bottom half of its peer group with respect to fees and again was in the bottom half of its peer group for performance for the prior year.

228.    While performance improved for the year ending December 31,2018, the fees for the Wells Fargo Stable Return Fund Class N35 remained high enough to keep the Class N35 in the bottom half of its peer group.

229.    Defendants could have reduced the costs of this fund by almost 50% by simply including Class N in the Plan instead of Class N35.

230.    When Defendants finally realized that Plan participants were paying too much, and replaced the Wells Fargo Stable Return Fund Class N35 with the Wells Fargo Stable Return Fund Class N, they nevertheless chose to keep millions of Plan-participant dollars in yet another Wells Fargo fund that then ranked in the bottom 5% when compared to returns of similar funds for the one year ending December 31, 2019, the bottom 35% based on the three years ending December 31, 2019, and only barely in the top 50% for the five years ending December 31, 2019.

231.    As of December 31, 2020, the Wells Fargo Stable Return Fund's (Class N shares) performance was in the bottom 10% for the prior one-year period, bottom 10% for the prior three-year period, and bottom 20% for the prior five-year period.

232.    By including and retaining both the Wells Fargo Stable Return Fund Class N35 and then the Wells Fargo Stable Return Fund Class N in the Plan, Defendants showed that they were more loyal to Wells Fargo than to the Plan and its participants.

233.    No conflict-free, loyal, prudent process for selecting, retaining, and monitoring the Plan's investment options would lead fiduciaries to retain the Wells Fargo Stable Return Fund Class N35 or the Wells Fargo Stable Return Fund Class N in the Plan.

### Defendants Allowed the Plan to Pay Unreasonable Recordkeeping Fees.

234.    As noted above, under 29 U.S.C. § 1104(a)(1), Defendants must "defray[] reasonable expenses of administering the plan" and act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

235.    One of the responsibilities of administering the Plan is to select and retain a recordkeeper, paying only reasonable expenses.

236.    Defendants utilized Wells Fargo as the recordkeeper throughout the Class Period until January 2021.

237.    Prior to 2019, Wells Fargo was paid in various ways, including revenue-sharing and other indirect methods that were not transparent.

238.    However, at all times in the Class Period, and continuing even now, Defendants never chose to pay Wells Fargo based on a method that was directly tied to the amount of

recordkeeping work that it did for the Plan, nor did they choose to pay Wells Fargo based on the fair market value of the services it provided to the Plan.

239.    Based on the Plan's Form 5500 filings, as well as other available documents, it appears the recordkeeping fees Wells Fargo charged the Plan during the Class Period, equate to the following on a per-participant basis:

| Year | Per-Participant Recordkeeping Fee |
|------|-----------------------------------|
| 2015 | $109 |
| 2016 | $62 |
| 2017 | $49 |
| 2018 | $65 |
| 2019 | $63 |

240.    These recordkeeping fees far exceeded the reasonable, market rate for similarly sized plans during the Class Period, as evidenced by industry survey data.

241.    Had Defendants properly discharged their fiduciary duties in accordance with ERISA, they would have continually monitored Wells Fargo's recordkeeping fees and negotiated reductions that were in line with the market. Defendants' failure to do so resulted in damages to the Plan and a reduction in retirement benefits for Plan participants.


## CLASS ACTION ALLEGATIONS

242.    In addition to bringing this action on behalf of the Plan, pursuant to ERISA, Plaintiff also brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class defined as: All participants in and beneficiaries of the Plan during the six-year period preceding the filing of this Complaint through the present, with the exception of Defendants, Defendants' beneficiaries, and Defendants' immediate families.

243.     Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

244.     The class satisfies the numerosity requirement because it is composed of thousands of persons, in numerous locations.

245.     The Plan had thousands of participants and beneficiaries in every year of the Class Period, all of whom suffered from the limited, imprudent investment options and excessive and improper fees alleged herein.

246.     The number of class members is so large that joinder of all its members is impracticable.

247.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members.

248.     Common legal and factual questions include, but are not limited to:

A.     Whether Defendants were fiduciaries responsible for monitoring and making decisions with respect to the investments in the Plan and services for the Plan;

B.     Whether the investment decisions made by Defendants were prudent;

C.     Whether the investment decisions made by Defendants were solely in the interests of Plan participants and beneficiaries;

D.     Whether the Plan suffered losses as a result of Defendants' fiduciary breaches; and

E.     Whether Defendants' acts proximately caused losses to the Plan and, if so, the appropriate relief to which Plaintiff, on behalf of the Plan and the Class, are entitled.

249.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims, and the claims of all Class members, arise out of the same conduct, policies and

practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

250.   Plaintiff will fairly and adequately represent the Class and has retained counsel competent in the prosecution of ERISA class action litigation.

251.   Plaintiff has no interests antagonistic to those of other members of the Class.

252.   Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

253.   Plaintiff has standing to bring this action on behalf of the Plan because he is a participant in the Plan and was injured by Defendants' unlawful conduct.

254.   Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently or as of the time the account was distributed, and what his accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

255.   Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

256.   Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

257.   In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making

appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

258.    In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

### CAUSE OF ACTION: BREACH OF FIDUCIARY DUTIES UNDER ERISA

259.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

260.    At all relevant times, Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

261.    As explained above, as the fiduciaries in charge of a "massive" retirement plan, Defendants breached their fiduciary duties to the Plan and its participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

262.    As detailed above, Defendants had fiduciary responsibilities with respect to selecting, monitoring, and removing investment options in the Plan and minimizing recordkeeping fees.

263.    As detailed above, Defendants caused the Plan to invest millions of dollars in investment options that were not in keeping with their fiduciary responsibilities, and Defendants failed to monitor and minimize the Plan's recordkeeping costs.

264.    By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of 29 U.S.C. § 1104(a)(1)(A).

265.    By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

266.    By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Plan in a manner that diversified the investments of the plan so as to minimize the risk of large losses, in violation of 29 U.S.C. § 1104(a)(1)(C).

267.    Each Defendant knowingly participated in each violation by the other Defendants, knowing that such acts were a violation, enabled the other Defendants to commit violations by failing to lawfully discharge such Defendant's own duties, and knew of the violations by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy those violations.

268.    Accordingly, each Defendant is also liable for the violations by its co-fiduciaries under 29 U.S.C. § 1105(a).

269.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants have paid substantial excess investment management, recordkeeping, and other fund-related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109 and 29

U.S.C § 1132(a)(2).

270.    The Plan and its participants suffered millions of dollars of losses due to these excessive costs and lower net investment returns.

271.    If Defendants had complied with their fiduciary obligations, then the Plan would not have suffered these losses, and Plan participants would have more money available to them for their retirement.

272.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

273.    In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

274.    WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that Plaintiff may proceed on behalf of the Plan, in accordance with ERISA;

B.    A determination that this action may proceed as a class action under Rule 23(b)(1) or, in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

C.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

D.    A declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

E.    An Order compelling the Defendants to make good to the Plan all losses to

the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

F.      An order requiring CCBA to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against CCBA as necessary to effectuate said relief, and to prevent CCBA's unjust enrichment;

G.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

H.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

I.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

J.      An award of pre-judgment interest;

K.      An award of costs pursuant to 29 U.S.C. § 1132(g);

L.      A service award to the Class Representative;

M.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

N.      Such other and further relief as the Court deems equitable and just.

Respectfully submitted by,

**FOULSTON SIEFKIN LLP**

*/s/ Scott C. Nehrbass*
Scott C. Nehrbass, KS #16285
Nancy E. Musick, KS #28258
32 Corporate Woods, Suite 600
9225 Indian Creek Parkway
Overland Park, KS 66210-2000
Phone:  913.253.2144
Fax:   913.498.2101
Email: snehrbass@foulston.com
         nmusick@foulston.com

Boyd A. Byers, KS #16253
Alexandra N.C. Rose, KS #27247
FOULSTON SIEFKIN LLP
1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466
Phone:  316.267.6371
Fax:   316.267.6345
Email:  bbyers@foulston.com
         nrose@foulston.com

ATTORNEYS FOR PLAINTIFF